ERASTUS RAWSON, Appellant, *v.* NATHANIEL B. CURTISS *et al.*, Appellees.

APPEAL FROM COOK.

A witness should not be permitted to characterize a paper as a letter of credit; the paper should be produced, or proper steps taken to have it produced, before its contents can be established orally. (A letter of credit described, and its character specified.)

An authority to draw, accept or indorse bills by an agent, may be presumed from acts of recognition in former instances; but these acts must be known to the party setting them up, if he intends to avail himself of such authority; and he must know that it was unrevoked.

Where parties deal with an agent having written authority, they must inform themselves of its extent and its limitations. Yet the principal will be bound, if he causes others to believe the powers of the agent to be greater than the written authority expresses.

Depositions used in a cause, should not be left with the jury, when they retire to agree upon a verdict.

THIS cause was tried before J. M. WILSON, Judge of Cook Common Pleas Court, and a jury, at June term, 1857.

E. C. LARNED, for Appellant.

G. GOODRICH and MANNING & MERRIMAN, for Appellees.

BREESE, J. This was an action of assumpsit, by Curtiss and Curtiss, the appellees, against Erastus Rawson, appellant, upon the following bill of exchange:

$1,500.                                      OFFICE, N. B. CURTISS, }
                                             *Peoria, December 28,* 1850. }

Three days after sight, pay to the order of N. B. Curtiss & Co., Fifteen Hundred Dollars, and charge the same to wheat account.

                                                        H. N. PEASE.
To E. RAWSON, ESQ., Chicago.

Acceptance and payment of this draft were refused by Rawson.

The declaration sets forth, in the first count, that, on the said 28th day of December, 1850, the said H. N. Pease, being duly authorized and empowered by the said defendant, did, in pursuance of such authority, make the said bill of exchange.

In the second count, that the said defendant, in consideration that the plaintiffs would then and there purchase of one H. N. Pease said bill of exchange, undertook and promised to accept the same, and to pay the same when due; and alleges as a breach, the refusal of the defendant to accept and pay said draft.

The third count declares upon the draft as accepted by Rawson.

To these are added the usual money counts.

The plea is the general issue.

The right of the plaintiff to recover on the draft sued on, is based upon an alleged authority in Pease, as agent of Rawson, to draw said draft.

The action was tried in September, 1855, at which time the jury failed to agree, and subsequently, in June, 1857, when a verdict was rendered against the defendant for the amount of the draft and interest.

The evidence, so far as it is material to the errors assigned, was as follows:

*John L. Coates* deposed: In the summer of 1850, he became acquainted with Pease, as the agent of Erastus Rawson, of Chicago, Cook county, Illinois. He came to witness, and represented himself as the agent of Mr. Rawson, to purchase grain, and as such, witness sold him grain; and also bought grain for Rawson, through Pease's instructions. Received from him currency and Pease's drafts upon Rawson for payment of the same: which drafts, as made by Pease, were paid by Rawson, and witness continued to know him in that relation until the month of January, 1851, as he thinks.

Has seen a letter of credit from Rawson to Pease. Owing to difficulties in the settlement of our former business, witness refused, in the fall of 1850, to do any further business with him, Pease, without written authority from Mr. E. Rawson. After a few days' delay he produced a letter of credit from Rawson, of such general terms and character, that witness again commenced buying for him. It was a general letter of credit, for him, Pease, to make drafts on Rawson in such sums as he might require, and upon such time as he could negotiate. Witness cannot give the exact wording of the letter, but that is the substance.

Was acquainted with Rawson's hand-writing; became so by frequent correspondence.

30

Witness believes it was genuine. Has since seen him write, and still believes it was the genuine signature of Rawson.

Was doing business, during the period aforesaid, in Peru, Illinois.

Rawson never denied to witness the agency of said Pease in relation to witness' first dealings with him.

The defendants excepted to the reading of the following portions of said deposition allowed to be read in evidence, the remainder having been excluded:

Ans. 3rd. In the summer of 1850, I became acquainted with him. He came to me and represented himself as the agent of Mr. Rawson to purchase grain, and as such I sold him grain, and also bought grain for Rawson, through Pease's instructions. Received from him currency and Pease's drafts upon Rawson for payment of the same; which drafts, as made by Pease, were paid by Rawson.

Ans. 4th. I have seen such letter of credit. Owing to difficulties in the settlement of our former business, I refused, in the fall of 1850, to do any further business with him, Pease. I again commenced buying for him.

Int. 8th. Did said Rawson ever deny to you the agency of said Pease, in relation to your first dealings with him?

Ans. He did not.

In another deposition of J. L. Coates, filed September, 1853, he stated he knew Erastus Rawson, of Chicago, in 1850; knew an agent of his, by name, H. N. Pease, in 1850, at Peru, Illinois. He was employed for purchasing grain, and making contracts for grain, for E. Rawson, by a written authority from Rawson; saw the authority and read it, having had it in possession. Sold him grain under his authority; received pay in part by draft drawn by Pease upon Rawson, based upon the same authority; this was in the month of October, 1850, as to date, according to witness' present recollection.

Int. 3rd. State the contents of that written authority, and how you know the contents; and whether or not you were then acquainted with the hand-writing of this defendant, Rawson; and whether or not said draft drawn by Pease upon Rawson was accepted and paid.

(Defendant's attorney objected to this question.)

Ans. It contained authority from Rawson to Pease to purchase grain, make contracts for grain, and draw drafts upon Rawson for that purpose. It was in my possession a day, probably longer; deposited with me by Pease. I was then acquainted with the hand-writing of defendant, Rawson; draft was accepted and paid by Rawson.

To the reading of the answer of the said Coates to the second

and third interrogatory, the defendant objected; the answer to third interrogatory was excluded.

The deposition of *Seth W. Hardin* stated he became acquainted with H. N. Pease in July, 1850; he was then purchasing wheat and corn in Peru, as he stated to witness, for E. Rawson, of Chicago, and got witness to receive said wheat and corn, and ship it for him to E. Rawson, of Chicago, and pay for the same as received, as he, said Pease, was traveling in different directions, making contracts for grain, to be delivered in Chicago, to E. Rawson. During the time witness was doing said business, he, Pease, advanced witness, from time to time, and between the 27th day of July, 1850, and the 29th day of August, same year, about eighteen hundred dollars, for which money witness gave his receipts to Mr. Pease, and which receipts were given up to witness to be cancelled, by Mr. Rawson, in Chicago, when witness settled with Rawson for that transaction. Witness did no more business with Pease or Rawson until December of the same year, when Mr. Pease came to him, on the fourth day of December, 1850, at which time he made a contract with witness, as the agent of Mr. Rawson, for five thousand bushels of corn in the ear, to be delivered in Chicago in the spring of 1851, to ·said Rawson. Mr. Rawson received the corn, and fully complied with the terms of the contract made by said Pease as his agent. Knows of Pease drawing drafts for money upon said Rawson. In the spring of 1851, he purchased a large quantity of wheat from Messrs. Day & Brother, for the payment of which he drew a draft, witness thinks for $500, on E. Rawson, which was paid by Rawson, after which Pease left and went down the river, and left the contract with witness to close for Mr. Rawson, which witness did, by shipping the wheat to Chicago, to Mr. Rawson, and by drawing on said Rawson for the balance due on said contract, to Messrs. Day & Brother. Mr. Pease had unlimited power to draw drafts at that time on Mr. Rawson. Witness was several times at Mr. Rawson's office, in company with Mr. Pease. Witness was acting as an agent also for Mr. Rawson, and had the same powers which Pease had to draw drafts on Mr. Rawson; and heard Mr. Rawson give instructions to Pease to purchase all the corn he could, at a price not to exceed certain figures, according to the market, and draw on him at any time for said sums as necessary. Witness knows that he was in the habit of drawing drafts on Mr. Rawson; was frequently with him in the Illinois River Bank, in the town of Peru, during the winter of 1850 and 1851, at which times he had his drafts on Rawson cashed for various amounts, say from three hundred to one thousand dollars. Have never heard of these drafts being protested; thinks he

should know if they were, as he was doing business as an agent at that time with Mr. Rawson, and drew on him, in the course of witness' business, to the amount of some fifty. or sixty thousand dollars, in the years of 1850 and 1851, and heard Mr. Rawson frequently speaking of the drafts drawn by Pease on him, and the amount he would be likely to lose by Pease's contracts, which he stated to be somewhere about six thousand dollars. During all which time witness received numerous letters, three of which are hereto attached, numbered from one to three, inclusive. Witness also hereto attaches a copy of the contract referred to in the fourth interrogatory, dated December 4th, 1850, and marked (4).

Knows of his purchasing oats, corn, wheat and wool at Ottawa, Hennepin, Spring Bay, Peoria, Henry and Peru, and at other points on the Illinois river, but not certain. He had the same authority from said Rawson as before referred to ; he was not limited to any particular point.

Witness adds, in explanation of a portion of his answer to the fifth interrogatory, wherein he stated that said Rawson stated that he would lose six thousand dollars by Pease, that in a subsequent conversation he had with Rawson, he stated that his loss by Pease would be merely nominal, very small, as he had taken Pease's property in Chicago, and also had made some money on a timber contract. This last conversation was in the summer of 1852.

The defendant objected to the reading of any part of this deposition, and objected specially to the reading of the following portions :

The whole of Ans. 4, also the following portions of Ans. 5 :

Ans. 5. "Yes, sir. In the spring of 1851 he purchased a large quantity of wheat from Messrs. Day & Brother, for the payment of which he drew a draft, I think, for $500, on E. Rawson, which was paid by Rawson, after which Pease left and went down the river, and left the contract with me to close for Mr. Rawson, which I did by shipping the wheat to Chicago, and by drawing on said Rawson for the balance due on said contract to Messrs. Day & Brother. I was several times at Mr. Rawson's office in company with Mr. Pease, and heard Mr. Rawson give instructions to Pease to purchase all the corn he could at a price not to exceed certain figures, according to the market, and draw on him at any time for said sums as necessary. I know that he was in the habit of drawing drafts on Mr. Rawson. I was frequently with him in the Illinois River Bank, in the town of Peru, during the winter of 1850 and 1851, at which times he had his drafts on Rawson cashed for various amounts, say from three hundred to one thousand dollars. I have never

heard of those drafts being protested. I think I should know it if they were, as I was doing business as an agent at that time with Mr. Rawson, and drew on him in the course of my business to the amount of some fifty or sixty thousand dollars in the years of 1850 and 1851, and heard Mr. Rawson frequently speaking of the drafts drawn by Pease on him, and the amount he would be likely to lose by Pease's contracts, which he stated to be somewhere about six thousand dollars. During all which time I received numerous letters, three of which are hereto attached, numbered from one to three, inclusive. I also hereto attach a copy of the contract referred to in the fourth interrogatory, dated December 4th, 1850, and marked (4)."

Also the answer of witness to seventh interrogatory, which were admitted in evidence. All the rest was excluded.

The deposition of *Samuel G. Smith* stated he was acquainted with a man by the name of Pease, who was acting as an agent for Mr. Rawson, during the years of 1850 or 1851, in Peru, and witness bought Pease's drafts on Rawson during that winter, and they were all paid ; cannot say how many, or what amounts, or in whose favor they were drawn, as sometimes he purchased drafts in his own favor, and sometimes in favor of persons to whom witness wished to remit to Chicago.

Defendants objected to the reading of any part of said deposition.

The following letter was then read in evidence by the plaintiffs :

*Chicago, January 8, 1851.*

MESSRS. N. B. CURTISS & Co.,

*Gents:*—Yours of the 6th inst. is received. I was very much surprised when I heard that Mr. Pease had got into difficulty. I have no doubt, from what I can learn, that he fell into the hands of some of the river blacklegs, and got pretty well fleeced. He has always, so far as I can learn, sustained a good reputation for integrity and honesty, and I do not believe that he was ever in the habit of gambling. He went down to Peru and Ottawa for the purpose of making contracts for me for corn, for which I was to pay him a commission by the bushel on all good contracts made at certain prices, and if you have the authority which I gave him, you will see that it refers only to contracts for grain. He was on his way here at Ottawa, when he telegraphed on what terms he could buy a certain lot of wheat at Peru. I answered him to buy it, and sent funds by express to pay. When the first $500 draft appeared, I supposed he had bought more than he had funds to pay, and also the second, although I hesitated some time before accepting. You say the two first drafts were accepted before the last was discounted. The second $500 was accepted the same day the last was presented. Pease's brother has gone down to inquire about matters, and I gave him a letter to you. Mr. Pease went to Peoria without my knowledge or consent. He has not written me since some time before he left Peru. He probably stopped at Peoria for the very purpose that he effected. I still think that he will make all right soon. He will, if it is in his power.

Yours, respectfully, E. RAWSON.

Rawson *v.* Curtiss et al.

Also the following agreement between plaintiffs and defendant:

I hereby authorize N. B. Curtiss to collect from O. C. Parmely, of Peoria, any amount due by him of H. N. Pease, said to be $1,450, and appropriate one thousand dollars thereof in part payment of a draft of fifteen hundred dollars, drawn by said Pease on me, dated December 28th, 1850; and I further authorize said Curtiss to compromise said claim with said Parmely for not less than $1,000, as he shall deem advisable, said Pease having assigned said claim on said Parmely to me.

*Chicago, Feb. 3rd,* 1851.                                  E. RAWSON.

Also the two following drafts:

$500.                                                       OFFICE OF N. B. CURTISS.
No. ——                                                       *Peoria, Dec. 25th,* 1850.
    One day after sight, pay to the order of N. B. Curtiss & Co., five hundred dollars, and charge the same to my account.                     H. N. PEASE.
    To E. RAWSON, Esq., Chicago, Ill.

$500.                                                       OFFICE OF N. B. CURTISS & Co.
No. ——                                                       *Peoria, Dec. 26th,* 1850.
    One day after sight, pay to the order of N. B. Curtiss & Co., five hundred dollars, and charge the same to my account.                     H. N. PEASE.
    To E. RAWSON, Esq., Chicago, Ill.

And which, it was admitted, were accepted on presentment, and paid; and that the mail was two days from Peoria to Chicago.

*R. W. Officer,* a witness for plaintiffs, testified as follows:

Was in the employ of plaintiffs in Peoria, in December, 1850, as book keeper; the plaintiffs were private bankers. Knew of the draft sued on being discounted by the plaintiffs. They furnished the money on said draft to a man by the name of Pease. A letter was shown by Pease to Curtiss, and Curtiss let him have the money. Does not know the contents of the letter; did not know the defendant's handwriting; to the best of his knowledge, the letter was produced to obtain the discount, and induce it.

Thinks the two previous drafts of $500 each had been accepted and paid by Rawson at that time.

On cross-examination, the witness stated: That he was not sure the previous drafts had been paid, but to the best of his recollection, the plaintiffs were advised they had been accepted, and he thought, one of them at least paid.

This was all the evidence of the plaintiffs.

*William Martin,* (for defendants,) testified as follows:

Knew H. N. Pease in December, 1850. Sold some corn at that time to E. Rawson, through Pease. Pease had a written authority from Rawson at that time. Had occasion to examine very particularly the written authority which Pease had at that

time, as he desired to know if he could deal with Pease under it. It authorized Pease to make contracts for corn for Rawson at prices specified in the writing. It gave Pease no authority to draw any draft on Rawson. Witness read said contract, and had it in his possession, and is sure it contained no authority to Pease to draw drafts on Rawson, (all of which evidence was objected to by plaintiffs).

Knows the character of S. W. Hardin among his neighbors for truth and veracity. It is very bad.

*Corrydon Pease,* (for defendants,) testified as follows :

Is a brother of H. N. Pease. Was in the employ of the defendant in December, 1850. Was present at an interview between defendant and H. N. Pease, when H. N. Pease started to go down the river, in winter of 1850, to make corn contracts. H. N. Pease settled up all his former matters with Rawson. Heard the writing read which Rawson gave him.

Question. State to the jury the contents of such writing as nearly as you can.

[Question objected to, and objection sustained, and defendant excepted.]

If you heard the contract, authority, or written instrument, which was given to said Pease by defendant, at said time, read, state the contents thereof.

[Question objected to ; objection sustained, and defendant excepted.]

Was there any authority given to said Pease, in said writing, to draw drafts on defendants ?

[Question objected to, and sustained, and defendant excepted.]

Witness then stated that he was present at the time the authority or order of February 3rd, 1851, was signed by Rawson. That Mr. Merriman, a lawyer, acted for the plaintiffs. That he stated to defendant that Curtiss must have this paper signed in order to enable him to proceed against the parties who got the money from Pease. Rawson objected to signing it, because he did not wish to sign anything which would make him liable to plaintiffs, or would admit any liability. Merriman told him that the paper would not render him liable, or affect him in any way, and the plaintiffs could not get the money without some such document from Rawson, and Rawson thereupon signed it.

Merriman had an interview with witness to try to obtain security for the amount of this draft. He said if it was not arranged in some way, it would be very bad for witness' brother. Witness got his son to make a mortgage of a piece of land to secure the debt, and Merriman was to come to Chicago to receive the deed. The deed was drawn and exe-

cuted by his son, but was never delivered, because Merriman did not come for it as agreed. H. N. Pease was not engaged in the grain business at all after January, 1851. He was off North-West, selling patent rights, and was not acting for Rawson or buying any grain for him. He was never in the grain business after January, 1851.

Pease cross-examined by plaintiff. H. N. Pease did not return from the North-West, where he had been selling patent rights, until the spring, in April. He was selling patent rights for himself and Rawson. Afterwards, in the summer, was in partnership with Rawson, in getting out and selling timber.

*P. A. Hoyne* and *C. P. Bradley* testified that they were well acquainted with S. A. Hardin's reputation for truth and veracity, among his neighbors, and that it was bad.

*H. N. Pease*, a witness for defendant, deposed in substance that he drew the draft sued on and received the money for the same, and the money was gambled off by a man named James Laflin, in Peru, Ill., at the Peoria House. He staked with him the money drawn by said draft. He was, at the time of drawing said draft, at Peoria, Ill. Previously to that time he was in the employ of the defendant, at Peru, Ill., and other points on the Illinois canal, for the purpose of buying grain. His engagements with defendant and employment, was exclusively confined to buying grain, and was to receive for his services from defendant, a commission of one per cent. per bushel. Laflin induced him to go to Peoria and he would play him even. He went there and staked money that he then had on hand belonging to Rawson, and then obtained more money by drawing two or three drafts on the defendant, which was all lost by gambling, except $500 drawn with one draft, which was sent to Chicago. The money on said drafts he got from plaintiffs, at Peoria, and with business letters of defendants, written him, showing he had been in defendant's employ, as before stated.

That he was authorized by Rawson to draw drafts on him for the purpose of buying grain at the places mentioned, by first advising him, Rawson, and procuring his consent to do so. He was not authorized to draw said drafts at Peoria. That he had no authority at the time said drafts were drawn, to draw any drafts on the defendant, except as above stated. That he had no writing from Rawson to bind him in any way in the transaction of drawing the drafts. That he had at one time a power of attorney or authority, once given him, by defendant, to proceed to Aurora and other points on Fox River, Illinois, to buy corn for defendant. This was in 1849. That he had lost said paper or destroyed it. The substance of this paper was: H. N. Pease is authorized to purchase grain on my account, which

I will pay for on delivery; signed E. Rawson. Is positive the authority proceeded no further than to authorize him to buy grain on Rawson's account. Said paper did not give him authority to draw drafts on said Rawson, neither to sign notes or any other negotiable securities for him, said Rawson. Rawson has not to his knowledge received any property on account of the draft sued on in this case. No grain or other property was purchased with the money obtained on said draft.

The letters which he had, and showed to plaintiffs at the time he obtained the money, were letters he had received at Peru and other points on the canal, written by defendant to him in relation to the purchase of grain, and authorizing him to draw on him for particular amounts, in response to notifications previously given him; none of these letters authorized him to draw on Rawson, at Peoria, for any sum. He has none of the letters.

On his cross-examination, he stated he drew one draft of $500 upon defendant, in favor of plaintiffs, a few days before he drew said draft upon which this suit arises. Did not know, neither had he been informed, it was paid at the time the others were drawn. Has no recollection of a second draft being drawn for $500. Did not know, nor did any person inform him before or at the time of drawing drafts, on which this suit arises, that any draft or drafts, previously drawn, had been paid. Is sure the drafts previously drawn had not been heard from, whether paid or not. All the transactions with plaintiffs, to the best of his recollection, occurred within two or three days. Showed to plaintiffs, or one of them, in the presence of Thomas Cheney, letters as before stated, and no more or further. Has no recollection of any other person being present at the time said draft was drawn.

Has frequently, previous to the date of said draft on said defendant, purchased grain for said Rawson, and frequently drawn drafts on him to raise money to pay therefor, which he had accepted and paid, and has drawn such drafts in favor of John L. Coates, of Peru, Ill.

The first draft or drafts, not the subject matter in suit, on which witness procured money from plaintiffs, witness stated to plaintiffs, or some of them, he wanted the money to buy grain for defendant.

Did buy from Cheney, of Peoria, Ill., some wheat in store at that place, about the time the first moneys were procured by him of defendant. The money procured on the drafts in suit, was after he had been introduced by Cheney as an agent of the defendant to buy grain. Is quite confident the plaintiffs, or their clerk, required no information as to the uses to be made

of the money, nor did witness make any representations of that kind, so well as he can now remember. Has no recollection of stating to plaintiffs or their clerk, or any of them, that this money was required for any specific purpose, but simply he wanted to get more money on a draft to be drawn by him on Mr. Rawson (the defendant).

Had been in defendant's employ about two years, at first, for about four months, as a laborer in his warehouse in Chicago, afterwards purchasing wheat on the market, of wagons, for him, some two or three months, and afterwards, for about six months, buying grain on the river and canal for him. Before this time, wages by the day, and then the contract between defendant and witness was entered into, of which he has before spoken, to buy one hundred or a hundred and fifty thousand bushels of corn at a commission of one (1) cent per bushel. After these drafts were drawn (about three months after), jointly on account, dealing in timber, cattle and sundries, including patent rights. This continued up to the fall of 1852.

Did not set over to Rawson (defendant) any real or personal property or interest therein, after the drawing of said draft, or at any time, for the purpose of indemnifying him against said draft. Had previously used money of defendant Rawson in buying property, and he had advanced money for such purposes and the general business they were engaged in. Also, had, previous to the Peoria affair, gambled away a great deal of money, whereby he had got in debt to Rawson a large amount, and to repay him the honest debts he owed him, witness sold and conveyed to him property to a considerable amount, yet not enough to pay him what he owed him, and is yet in debt to him on those transactions referred to.

About the time witness drew said draft, he sent the $500 which he drew on the $500 draft, for his wife, by express, to Goss & Hoag, of Chicago, or their care; did not give Rawson an order for the same, but believe he received it of witness' wife, by his direction, to reimburse or pay the $500 draft which witness had previously drawn, and believes it was paid. No part of the $500 so sent was money drawn on the draft for which suit is brought.

Has no recollection of ever giving an order to Rawson on Parmlee, for any amount of money; but told Rawson that Parmlee did win about $2,800 of him, being money witness had of Rawson, which he took with him when he left Chicago.

· Has never, as he recollects, stated to any person that the written authority from Rawson to him, to do business, had been thrown overboard from a steamboat and lost.

May have stated to Mr. Rawson, that the authority referred

Rawson v. Curtiss et al.

to by witness in direct examination, had been lost or destroyed; further than that, has no recollection of stating anything about it to any person.

Has never been written to by defendant, or any other person, in relation to what he could testify to in this case. Has only been written to that his testimony would be required in the case, and notified who the commissioner was, and where he could be found; also that it was important to have his testimony. Has not in his control any letters he has received on this subject, as he deemed them of no importance and did not preserve them.

The substance of neither the direct nor cross interrogatories has been made known to him, except in the order propounded to him by the commissioner in this case.

On the re-examination being resumed, he testified in substance, as follows:

Had no authority from Rawson to draw any drafts by witness drawn in Peoria on him. Those drafts (if there were two drawn) were drawn about the same time, with the one which is the subject of this suit; two or three days covering the whole transaction at the time this draft was drawn or discounted, as before stated. Has no knowledge of the fate of the said two drafts not sued on.

Upon the foregoing state of facts, the court gave the following instructions to the jury on the part of the plaintiff, to the giving of which the defendant excepted:

" If the jury shall believe, from the evidence, that Pease presented to Curtiss & Co. a letter or written authority from Rawson, authorizing Pease to draw drafts on Rawson, and on the faith of such authority, Curtiss & Co. discounted the draft of Pease on the defendant, then Rawson was bound to accept and pay said draft, and the plaintiff is entitled to recover the amount of said draft and interest, at six per cent. to the present time, from the time of presentation of the draft.

" If the jury shall believe, from the evidence, that Pease had been allowed by Rawson, previous and down to the date or near the date of the draft in question, to draw drafts on him as his agent, and for his use, for grain, or to procure money to be used for that purpose, and that Rawson had accepted and paid the same, that is evidence from which the public might, and the jury may imply a general authority to draw such drafts.

" If the jury shall believe, from the evidence, that Rawson had given Pease authority to draw drafts, and he had been in the habit of drawing such drafts in favor of Coates, Smith and others, to raise money, or buy grain for Rawson, and as his agent, and such drafts had been paid by Rawson, then, unless

Curtiss & Co. knew that such authority had been withdrawn, these are facts from which the jury may infer authority to draw the draft in question, and if they do so infer, the plaintiff is entitled to recover.

"If the jury shall believe, from the evidence, that Pease had been and was in the habit of drawing drafts on Rawson as his agent, and for his use, to buy grain or raise money by discounts thereof, in favor of Coates, Smith or others, which Rawson paid, these are facts from which a general agency and authority to draw drafts, to raise money or buy grain, might be inferred; and though the agent may have misapplied the funds, and intended to do so at the time he drew such drafts, such misapplication, or intended misapplication, will not discharge the person on whom such draft was drawn, unless the person discounting it knew of such intention at the time he discounted the same."

The defendant then asked the court to give the following instruction, which the court refused to do:

"If the jury believe, from the evidence, that the defendant Rawson gave to Pease a written authority to make contracts for grain for him, and that said Pease was acting under written authority when he drew said draft, and that such written authority gave Pease no power to draw drafts on Rawson, then such written authority was the limit of Pease's power to act for Rawson, and constituted him a special agent for the purpose specified, and the plaintiff, in dealing with him, was bound to take notice of such written authority, and no act of Pease's, not authorized thereby, would bind Rawson; and that, if in such case, Pease drew the drafts on Rawson without authority, which Rawson accepted, such acceptance would not enlarge the powers of said Pease, or give him any authority to draw further drafts or to make Rawson responsible upon any further drafts, unless a practice or custom by Rawson to accept drafts so drawn, of such a nature or frequency, were proven, as would justify the plaintiff in regarding Pease as the authorized agent of Rawson for drawing such drafts, and if no such custom or habit has been proven, then the law is for the defendant."

But the court gave for the defendant the following instructions:

1. Unless the jury believe, from the evidence in this case, that Rawson expressly or impliedly authorized Pease to draw the draft in question, then Rawson is not bound, and they should find for the defendant.

2. If the jury believe, from the evidence, that Pease was in the employment of the defendant, Rawson, as a grain runner or agent to buy grain and procure contracts for grain, such agency and employment would, of itself, give no authority to Pease to draw the draft sued on, and the law is for the defendant, unless

the jury further believe, from the evidence, that authority to draw said draft was given to said Pease by the defendant.

3.   In order to entitle the plaintiff to recover in this suit on the ground of an express authority, it must be proven that the defendant authorized the said Pease to draw the said draft, and such authority must be established either by express authority or by circumstances of such a nature as to satisfy the minds of the jury that such an authority to draw the draft sued on was given by the defendant to Pease.

4.   If the jury believe, from the evidence, that Pease had no authority from Rawson to draw drafts upon him, the mere acceptance, by Rawson, of one or two drafts, would not, of itself, authorize Pease to draw another draft, and would not, of itself, raise any obligation on Rawson to accept another draft.

5.   If the jury believe, from the evidence, that Pease drew a draft in favor of the plaintiffs, on the defendant, on the 25th December, 1850, which the defendant, on the 27th December, accepted, and that said Pease drew a second draft on the 26th December, which Rawson accepted on the 30th December, and that Pease had no authority to draw either of said drafts, then the acceptance of said drafts, or of either of them, by Rawson, would not, of itself, give the said Pease any authority to draw the draft sued on in this suit; and if the jury believe that no other authority was given by the defendant to Pease to draw the draft sued on, then the law is for the defendant.

6.   Unless the jury believe, from the evidence, that the defendant, Rawson, was in the habit of accepting drafts drawn on him by Pease, and that such was the course of dealing between him and Rawson, then the fact that at and about the same time the draft sued on was drawn, Rawson accepted one or two drafts drawn on him by Pease without Rawson's authority, would not of itself, constitute Pease the agent of Rawson to draw other drafts, or obligate Rawson to accept any other drafts in such case, unless they further believe, from the evidence, that Pease was expressly authorized to draw the draft sued on in this suit, the law is for the defendant.

7.   If the jury believe, from the evidence, that Coates obtained an authority from Rawson to make a specific purchase, and draw a specific draft on him, and there is no evidence that such authority was general or covered any other transaction, then such authority would give no power to draw the draft in question, and if they believe that the said authority was obtained for that specific case, and no evidence besides that of the said Coates has been offered refuting said authority, then the statement of the said Coates, that he " does not mean to say it was confined to that transaction," without any evidence, either by

him or by any other witness that it extended any further, would not authorize the jury to presume that it did extend any further than the particular transaction for which it was obtained.

8.   If the jury believe, from the evidence, that the draft in question was, on the face of it, drawn on " *wheat account*," and that Curtiss & Curtiss might have, by a little inquiry, or by a telegraphic dispatch, have ascertained whether Pease had authority to draw the draft, and that they neglected to make such inquiry, and if they further believe there was no express authority to draw said draft, and that it was taken by plaintiffs without due inquiry and care, this is proper to be considered by the jury in determining whether defendant is or is not liable.

The defendant then requested the court not to allow the depositions of S. W. Hardin, J. L. Coates, A. G. Bozel and S. G. Smith, portions of which had been excluded, to be taken by the jury to their room, on retiring.

But the court allowed the said depositions to be taken by the jury.   To this decision the defendant excepted.

The defendant then moved the court to withhold from the inspection and possession of the jury the portions of said depositions which had been excluded by the court, which the court refused to do, but allowed the jury to take said depositions with the portions excluded, marked in pencil by the court.

To this decision of the court, allowing said excluded parts of said depositions to go into the possession of the jury, the defendant excepted.

The defendant then moved the court to detach from the deposition of S. W. Hardin, and withdraw from the inspection of the jury, the letters and agreement which had been excluded by the court, which the court refused to do ; to which refusal of court the defendant excepted.

The jury thereupon returned a verdict for plaintiff.

The defendant filed the following grounds of motion for new trial.

1st.   Newly discovered evidence, affidavit of Seth W. Hardin.

2nd.   The court erred in giving and refusing instructions.

3rd.   The court erred in allowing evidence and documents excluded to go to the jury.

4th.   Court received incompetent and excluded competent evidence, and for other reasons.

The defendant filed affidavits of S. W. Hardin and E. Rawson, in support of motion for new trial.

*Seth W. Hardin* being sworn, says that his deposition was taken in this cause, and is marked, Filed November 5, 1856 ; that said deposition was taken at Peru, in October, 1856, and purports to be taken before Patrick M. Killduff, as justice of

the peace, but that he has no recollection whether he was or was not present at the time.

That the deposition was written by Mr. Merriman, who acted as attorney for plaintiff, no party appearing for defendant; that he has no recollection of its being read over to him, nor did this deponent read it over himself, and from the fact that it contains several erroneous statements which this deponent never intended to swear to, does not believe it was read over to him. He was hastily examined, without having time to refresh his recollection, and he now finds, on reading over said deposition, that it contains several errors and mistakes. This deponent states that he never intended to swear, for such was not the fact, that Pease drew a draft on Rawson for $500, in favor of Day & Brother, in payment of wheat purchased of Day & Brother, but said payment was money sent to this deponent by Rawson, and which deponent paid to Day & Brother himself.

That the sum of $1,800, said to have been advanced by Pease to this deponent, in said deposition, this deponent meant to state was money sent by Rawson to this deponent, by the hand of Pease, in packages, and addressed to this deponent.

This deponent has seen his letter, addressed to Rawson, dated January 4, 1851, in which this deponent speaks of Pease having been gone about two weeks, which satisfies this deponent he was in error in stating, in answer to fifth interrogatory, that Pease purchased a large quantity of wheat of Day & Brother in spring of 1851, as this deponent has never seen said Pease since the date of his letter to Rawson, of January 4th, 1851. I have no knowledge of Rawson ever authorizing Pease to draw drafts on Rawson, and he never did draw any to my knowledge. All I knew on the subject was from Pease's statements, and I intended so to testify. I have no knowledge of Pease buying wheat and corn for Rawson, except from Pease's statements.

Pease did not buy any grain for Rawson, to my knowledge, at Peru or elsewhere, except from Pease's statements as to what he had been doing; that this lot, bought of Day & Brother, was paid for by me.

This deponent states, that his answer to fifth interrogatory does not correctly state what he intended to swear to. He intended to state, in regard to those matters of purchasing grain by Pease, and drawing drafts, merely what Pease had said to me (him) on the subject, and not anything by Rawson.

This deponent states, that on reading over said deposition, he is satisfied that it sets forth erroneously his statements, to the prejudice of Mr. Rawson, and makes him say many things which he never intended to testify to.

*Erastus Rawson* being sworn, says, that the depositions of

Seth W. Hardin, and S. G. Smith, and John L. Coates, were taken without his knowledge, and that he had no opportunity to cross-examine the same; that he believed substantial justice requires that he should have a new trial; that he did not know, until to-day, of any means of establishing the facts disclosed by the affidavit of Seth W. Hardin; that he accidentally heard of the facts stated in Hardin's affidavit by meeting him in the streets of Chicago, and asking him to examine his deposition, when he stated it contained many erroneous statements, and such as he never intended to make.

The plaintiffs filed a counter affidavit of Amos L. Merriman, as follows:-

*Amos L. Merriman* being first duly sworn, deposes and says, that he is one of the attorneys of plaintiffs; that deponent attended to the taking of the deposition of Seth Hardin, on the 16th day of October, A. D. 1856; that deponent saw Mr. Hardin on the 15th day of October, and informed said Hardin that he wished to take said deposition on the following day, in said suit, in the course of which conversation said Hardin said he had numerous letters from Mr. Rawson, which letters he said he would look up and produce on his examination, which letters he did produce, and are attached to his deposition. Deponent further says that the deposition was taken by Patrick M. Killduff, a justice of the peace of La Salle county.

That deponent has this day read the said deposition of said Hardin, and also the affidavit of said Hardin, filed in this court, and can state positively, and does state, that the said deposition was written by said Killduff; that the caption of said deposition and the interrogatories are in the hand-writing of deponent, but the answers thereto of the said witness are in the hand-writing of said Killduff. Deponent further states that the said deposition was, according to the best of deponent's recollection, carefully read to said witness before his signature thereto, and that he stated it was correct.

The following are the errors assigned:

1. That the court erred in admitting incompetent evidence, and excluding that which was competent.

2. The court erred in giving each and every of the instructions given for the appellee.

3. The court erred in refusing the instruction asked for by the appellants.

4. The court erred in allowing depositions and documents introduced in evidence to be taken with them by the jury, on retiring to consider of their verdict.

5. In allowing portions of the depositions which had been excluded, and letters and papers which had been excluded, to

be taken with them by the jury, on retiring to consider of their verdict.

6.  In overruling the motion for a new trial.

The question presented by these facts is, was this draft now in suit authorized by defendant, and is he liable to pay it?

It is insisted by defendant's counsel that he is not liable on it, there being no proof of authority in Pease to draw the draft. That the evidence by which his authority is sought to be established, and received by the court, was not legitimate evidence.

The testimony to establish the authority, are the depositions of Coates, Smith and Hardin.

Coates, the witness for plaintiff, states that in the summer of 1850, Pease, as agent of Rawson, purchased grain for him, and he sold him grain, and bought himself grain for Rawson through Pease's instructions, and received from him currency and Pease's drafts on Rawson for payment of the grain, and which drafts were paid by Rawson, and witness continued to know Pease in that relation until the month of January, 1851, as he thinks. He further says, in the fall of 1850, he saw *a letter of credit* from Rawson to Pease, the contents of which he gives, or the substance of it, but which the court excluded, but refused to exclude that portion of his testimony which spoke of " a letter of credit."

We think the witness had no right to give a character to this letter, by calling it a letter of credit, or to speak of it as a letter of credit. That is a writing of vast importance in business matters, and is defined to be an open or sealed letter from one merchant in one place, directed to another, if special, in another place or country, or if general, to all persons where the bearer of the letter may go, requiring him or them, if the person named in the letter shall have occasion to buy certain commodities, or to want money to any particular or unlimited amount, that he will either procure the same or pass his promise, bill, or other engagement for it, on the writer of the letter undertaking therein that he will provide him the money for the goods, or repay him by exchange, or give him such satisfaction as he shall require, either for himself or the bearer of the letter. 3 Ch. Commercial Law, 336.

The court permitted the witness to give this character to a paper which was not produced, and its non-production unaccounted for, violating that familiar rule of evidence, that the contents of a writing cannot be shown by parol, unless notice to produce it has been given and disregarded, or that it is lost or destroyed.

The fact that the letter was a letter of credit, was not for the witness to establish; the letter itself should have been pro-

duced, so that the court and jury might see it and determine its character.

In his second deposition, the court permitted this witness to say, on objection being made, that he knew an agent of Rawson by the name of H. H. Pease, in 1850, at Peru, in this State; that he was employed for purchasing grain, and making contracts for grain, for E. Rawson, by a written authority from Rawson; saw the authority and read it, having had it in his possession; sold him grain under his authority, received pay in part by draft drawn by Pease on Rawson, based on the same authority; this was in October, 1850.

This testimony is of the same objectionable nature. It was not competent for the witness to speak of this written authority, its purport and scope, and the court should not have permitted it.

The testimony of S. W. Hardin was objected to, or that portion contained in his answer to the fourth and fifth interrogatories.

So much of those answers as gives the declarations of Pease, that he was the agent of Rawson, should have been excluded. Agencies, however created, are to be proved in a different manner. Nor could he speak of the authority Pease had, and its extent, it being written authority, as we infer from his testimony.

But the appellant's counsel insists that this testimony is objectionable *in toto*, not being pertinent to the issue then pending; and that issue was, had Rawson, by any act of his, in his relations with Pease, held Pease out to Curtiss & Co. as his agent to draw drafts, and did Rawson's conduct tend to deceive Curtiss & Co. ?

No express authority to draw this draft is shown. Pease himself denies he had any. Nor does it appear that Curtiss & Co. had any knowledge whatever, at any time, of the previous transactions of Pease, with Coates, Hardin and others, or that he discounted the bill on the faith of those acts. On the contrary, R. W. Officer swears, that he was their book-keeper, the plaintiffs being private bankers; knows the draft sued on being discounted by the plaintiffs; they furnished the money on the draft to a man by the name of Pease. *A letter was shown by Pease to Curtiss*, and Curtiss let him have the money. Does not know the contents of the letter; did not know the defendant's hand-writing. To the best of his knowledge, the letter was produced to obtain the discount, and *induce* it.

The principle is well settled that an authority to draw, accept, or indorse bills, may be presumed from acts of recognition in

Rawson *v.* Curtiss et al.

former instances, but those acts must be known to the party setting them up.

In all such cases it must appear that the bill or note was taken and discounted on the faith of prior similar transactions, and therefore the holder of a bill purporting to be, but not in fact accepted by the person to whom it was addressed, cannot recover against the apparent acceptor by proving a fact *subsequently* discovered, that on a former occasion the defendant had given a general authority to the person who accepted in his name, to accept bills for him; to make such authority available, the holder must show, either that the authority remained unrevoked at the time of the acceptance, or that he took the bill on the faith of such authority. Chitty on Bills, 31.

That this bill was discounted on the faith of these prior transactions with Coates and others, is expressly negatived by the testimony of Officer, the book-keeper, who swears that the letter produced by Pease " induced " the discount. Curtiss did not deal with Pease, on the faith of the Coates' or other prior drafts.

All the testimony, then, of these prior transactions being unknown to Curtiss at the time he discounted this bill, was inadmissible, as not tending to prove the issue.

But the appellee insists they tend to show a habit of drawing, and for that purpose were admissible. Not being known to Curtiss at the time, he cannot, on any correct principle, invoke their aid for this or any other purpose, in this case. They were wholly irrelevant and should not have gone to the jury.

The other ground of claim is, that the appellant had accepted and paid one draft of $500, drawn on the 25th of December, and accepted another for the same amount drawn on the 26th, and that this is such a recognition of the power to draw, as to render him liable for this draft.

The testimony of the book-keeper on this point, is by no means positive or satisfactory, and not such as would be expected from a banker's clerk, who, like his books, should be correctly posted on such subjects. He thinks they had been accepted and paid at that time. On his cross-examination, he says, he is not sure they had been paid, but, to the best of his recollection, Curtiss was advised they had been accepted, and he thinks one of them, at least, was paid.

Where is this letter of advice? Why was it not produced?

There is testimony showing that two days was the mail time between Peoria and Chicago, and it is barely possible the draft drawn on the 25th may have been presented and accepted, and advices received by telegraph by the 28th, the date of the draft in suit, but on this point there is no satisfactory evidence. It

not being proved that any advices of the acceptance or payment of either of these drafts had been received by Curtiss & Co., at the time the draft in suit was drawn, and so easily proved, if so, the plaintiffs can claim nothing on account of their after acceptance and payment. It could not influence them, being ignorant of it, to discount this bill.

Nor is it shown, by the book-keeper, what the letter contained which Pease presented to Curtiss' house, nor that it was written by Rawson. The only certain evidence we have on this point is that of Pease himself, and of Rawson. Pease says, he showed to plaintiffs, or one of them, in the presence of Thomas Cheney, letters which he had received at Peru, and other points on the canal, written by the defendant to him, in relation to the purchase of grain, and authorizing him to draw on him for particular amounts in response to notifications previously given him. None of these letters, he says, authorized him to draw at Peoria, for any sum.

Corydon Pease speaks of "a writing" which Rawson gave H. N. Pease when he went down the river, in the winter of 1850, to make corn contracts; and William Martin states that Pease had a written authority from Rawson, in December, 1850, which he saw and read. Rawson's letter of January 8, 1851, to the plaintiffs, and which they have made evidence, fully corroborates the testimony of H. N. Pease, and shows what authority he really had. He writes: " He (Pease) went down to Peru and Ottawa for the purpose of making contracts for me for corn, for which I was to pay him a commission, by the bushel, on all good contracts made at certain prices, and if you have *the authority which I gave him, you will see that it refers only to contracts for grain.*"

Here, then, is all the proof of the authority Pease had at the time the draft in suit was discounted, and it appears from it that he was a special agent, limited by express written authority to contract for grain.

It seems strange that business men, like the plaintiffs, should not have kept the original, or a certified copy, of the letter Pease produced to them, or at any rate caused their book-keeper to examine it, so that he might be made a witness to its contents. No precaution whatever seems to have been used by the plaintiffs in the transaction. The amounts discounted were large enough to prompt cautious men to make all possible inquiry as to the authority to draw, and get satisfactory information, all which could be done by telegraph in a few hours.

There being no such knowledge in the possession of the plaintiffs, they can derive no advantage from the fact that they were

afterward accepted and paid; they were not the moving cause of the discount of this bill.

The moving cause was, unquestionably, the letter, as Officer says, or letters, as Pease says, which he produced to the plaintiffs; they, or some one of them, "induced" the discount. It was on the faith of these letters this bill was discounted, and on nothing else.

We have seen what those letters contained, and they confer no authority to draw drafts, but simply to make contracts for grain. Their claim to recover must rest on this written authority to make contracts for grain, and they must show—there being no express authority contained in it to draw drafts—that it is there by necessary implication.

An agent commissioned to make a contract for the purchase of any article, is limited to the usual and appropriate means to accomplish the end, and can resort to no other. Such an authority must be construed, as to its nature and extent, according to the force of the terms used, as well as the object to be accomplished. There being a written authority, persons dealing with the party holding it, are bound to inform themselves of its extent, and to inquire into its limitations. The authority was to make contracts for grain, not to purchase grain, the first of which can be fully exercised without the payment of money or drawing drafts, or giving negotiable paper, by simply signing a contract to deliver, with the terms and time and place specified. A power to purchase would imply the power to consummate the purchase by the usual means for such · purpose, drawing drafts or delivering proper securities. If, however, the principal, by his declarations or conduct toward the parties dealing with such agent, has authorized the opinion that he had in fact given more extensive powers to him than were conferred in terms by the writing, the principal ought to be, and would be, bound by the acts of such agent in his negotiations with such persons, at least to the extent of the authority which such declarations and conduct have fairly led them to believe did exist.

Relying upon this principle, the appellee's counsel brought before the court the prior transactions of this agent, and the conduct of the principal as to them, and cited the case of *Williams* v. *Mitchell*, 17 Mass. R. 98, as in point. We are not willing to yield our approbation of the decision in the case cited, but rather accord with the editor in his note to it. He says: "There seems to be a fallacy in the argument of the court in assuming that Allen had authority to make the purchase; in fact he had no such authority, and the goods bought were not, so far as appears, intended for, and did not in fact go to, the use of the defendant. The defendant, therefore, could not be

legally liable unless by some act done, or some authority given to Allen on some other occasion he had held out to the plaintiffs, or caused *them* to understand, or given *them* reason to believe that Allen was lawfully acting in this instance as his agent. This is negatived by the facts in the case. Allen gained the credit only by an act of his own wholly unauthorized. He was, so far as the plaintiffs were concerned, and was to be regarded, as a mere stranger, who had never been employed by the defendant, but who had forged a power of attorney from him to act on this occasion."

So in this case, the draft was not drawn for, nor were the proceeds applied to the use of the defendant, nor had he, by any act done, or authority given to Pease, on any other occasion held him out to the plaintiffs, or caused *them* to understand, or given *them* reason to believe that Pease was acting in that instance as his agent. He was, so far as the plaintiffs are concerned, and should have been regarded by them, as a mere stranger, who had never been employed by the defendant.

The same remarks apply, in sufficient degree, to the drafts of five hundred dollars each.

We have already said, that the proof in regard to these drafts is very unsatisfactory, and does not go far enough to show that plaintiffs must have had a knowledge of their acceptance before they discounted this draft. Why was not the evidence of their correspondent in Chicago had, to whom, it is presumed, they were transmitted, in the usual course of such business? There is such an absence of proof in this important branch of the case, where so large an amount is involved, as to lead to the suspicion that the whole affair was a hazard, for which Pease had to pay largely more than the current market rates for such a discount. We do not mean to say such evidence of acceptance would be sufficient to prove authority to draw this draft, unaccompanied by other evidence; it would be a step towards proving a habit of drawing, and induce the reasonable inference that, though Pease's power was special, he had been allowed by his principal to act beyond it in his dealings with the plaintiffs, and so fairly led them to believe that a more extended authority did in fact exist than simply to contract for grain.

There is nothing, then, in the conduct of defendant known to the plaintiffs at the time of this transaction, which could authorize an opinion to be entertained by them, that the agent had in fact powers more extensive than were conferred in terms by the writing or letters which he exhibited, or that defendant's conduct fairly led them to believe that such powers did exist, or justify the jury, in the face of an express authority, to extend it vastly beyond its terms and scope.

These remarks dispose of the first three errors assigned, and of the instructions, as given and refused, without noticing them in their order, or more particularly.

The fourth and fifth, being the remaining errors assigned, bring up an important question in practice, raised for the first time in this court, and should be now settled.

It has been the uniform practice in this State, unchallenged until now, to permit depositions read to the jury, to be taken with them in their retirement, and it is insisted that it is good practice, and expressly authorized by Section 20 of Practice Act, ch. 83, R. S. 1845.

That section provides, "when the jury retire to consider of their verdict, they shall be permitted to take any papers that may have been used as evidence on the trial."

These errors will be considered together.

It is said by defendant's counsel, that, at common law in England, permitting the jury to take out with them any papers without the consent of counsel, is error; yet, if the court allows the jury to take them out, it is not error; and 1 Graham and Waterman on New Trials, 79, is referred to, and a case in New York, in 5 Sandf. R. 219.

The reference in Graham and Waterman is a dictum of C. J. Tilghman, as to what the English practice is; but, he says, it has not been extended to Pennsylvania. At page 70, the doc-trine is stated to this effect: Where, after the evidence given, divers papers are read on both sides, and the clerk in making up his bundle of papers that were under seal, to deliver to the jury, the solicitor for the plaintiff delivered a bundle of depositions to the jury, some whereof were read, and some not read, and upon examination this appeared, though the jury swore they opened not the bundle delivered by the solicitor; yet the verdict for the plaintiff was, for this cause, avoided, and a *venire facias* awarded, and the oath of the jury, that they never looked into them, was not regarded.

The case, in fifth Sandford, was where the judge permitted the jury to take out with them, when they retired, a deposition which had been read in evidence by the plaintiff.

The court say, "we do not think this was a subject for an exception. If the permission was wrongly given, it was rather an irregularity which would not of itself avoid the verdict." The remedy of the defendant, if he is entitled to any, is by motion to the court, and then, upon hearing both sides, the verdict would be set aside or sustained, as justice between the parties might require." Reference is made to the case of *Hackley* v. *Hastie*, 3 Johnson's R. 252, in which the jury had carried out with them depositions taken under a commission,

without the consent of the counsel. The court denied the motion for a new trial, because it appeared from the affidavits of the jurors that the papers had not been read by them.

In 24 Wend. R., *Farmers' and Manufacturers' Bank* v. *Whitfield*, 426, the court say: " We think it impossible to uphold a verdict which may have resulted from allowing the jury to take with them, as evidence, a paper confessedly foreign to any of the matters in issue." So that, in New York, the question does not seem to be settled.

We are to decide it on principle and policy, and establish such a rule as shall prove safe in practice, and consistent with the due administration of justice in court.

The 20th section of the practice act, to which reference is made, contemplates nothing more than patents, deeds, notes and such like papers, "used as evidence." Depositions are the evidence itself, and can in no legal sense be regarded as papers used in evidence. Like oral testimony, they go to the ear of the jury, are to be impartially listened to by them, treasured up in their memories, and weighed carefully in their retirement.

The English rule is as stated in 1 Graham and Waterman on New Trials, which we have cited from page 71, and the reference to 2 Hale's Pleas of the Crown, 308, sustains it.

In this country, it may be considered as settled in the same way, notwithstanding a few cases seemingly different.

The errors assigned present two phases of the question; one, the propriety of the depositions going to the jury at all, and the other, to the excluded parts only of such depositions.

It is certainly not the policy of the law, to give a superiority to depositions over oral proofs. With the oral proofs, given by witnesses on the stand, the jury must be content, and make up their minds upon it, some of which, important to be remembered, may be—such is the infirmity of the human memory—forgotten. The adversary, having no other than written testimony, contained in depositions, which the jury, taking them with them, can read, discuss, dissect and, if disposed, torture the words from their true meaning, and which are constantly before them, during their deliberations, to operate on them, has a most manifest advantage over him whose proofs are oral, which no rule of law or practice should accord to him. The deposition should be regarded as the living witness speaking from the stand, and as he cannot be taken into the jury room, but only what he has said, so neither should the deposition be so taken, but only the words and facts contained in it, and given out from it, as from the living witness. The parties are then upon equal grounds, the one having no advantage over the other.

We are clearly of opinion that the practice which has

Rawson *v.* Curtiss et al.

obtained of permitting depositions to be taken out by the jury, either with or without the direction of the court, is wrong practice, and should be abolished. It is no answer to say, as some courts have said, that it may be safely left to the discretion of the court to allow it or refuse it, for we all know that no relief can be had from the direct consequences which may flow from the exercise, by a court, of a power purely discretionary.

This disposes of the other error assigned, on the principle that the greater includes the less; for if it be error to permit depositions to be taken out by the jury when objectionable, it is more so when they are mutilated. Portions of the depositions had been excluded, and the record does not show that the court gave the jury any instructions in regard to such parts, but marked them merely by lines drawn around them in pencil, and this, the plaintiffs contend, was a sufficient instruction to them to disregard the portions thus marked; and it is to be presumed they did their duty by obeying the instructions thus given. The jury may, or may not, have disregarded the marked portions. This cannot be known certainly, as there is no proof to the point, but it is certainly apparent that they had no other instructions; they were not told in express terms to disregard them. Even had they been thus told, such is our nature that, by the very command not to regard them, curiosity would be aroused to know what they were—what secret it is the court designs to hide from them—what tree of knowledge of good and evil, the fruit of which is forbidden to us, and, like their first parents, in God's own garden planted for them, they would pluck and eat. It is human nature, and mountains of instructions could not crush it out. Reading and pondering these rejected portions, and reasoning with one another why they should have been excluded, their minds would naturally be impressed by them, and they unconsciously form conclusions from the rejected evidence. Few know the secret and insidious manner by which impressions are made on the mind, or how slight the operating cause may be. We think it is not at all probable the jury would have found the verdict they did if the depositions had not been taken out with them, and the excluded parts read, and impressions received from them.

These points have been considered by other courts, and there seems upon it quite an uniformity of opinion. In *Lonsdale* v. *Brown*, 4 Wash. C. C. R. 157, Mr. Justice WASHINGTON says: "The next reason alleged is, that the jury took out with them a deposition, part of which was objected to at the trial by the defendant's counsel, and the objection allowed by the court. The fact, as stated, is fully made out in proof, and the question in point of law is, whether this be a sufficient ground for setting

aside the verdict. If the parts of the deposition which were not read were material to the plaintiff's case, we should think the verdict ought not to stand. So if the deposition had been delivered to the jury by the defendant's counsel, without the consent of the other side, although it fully appeared that the rejected parts had not been read by the jury. But if the evidence be altogether irrelevant, and immaterial to the issue, and the deposition is taken out by the jury by mistake, we think it would be going too far to set aside the verdict, when the court cannot but perceive that it could not have influenced the finding of the jury."

He puts the case on two grounds—the materiality of the rejected parts, and delivering a deposition to the jury by one party, without the consent of the other side.

In this case, the rejected portions were most material. In Coates' first deposition, this statement bears the pencil mark, " I became acquainted with him as the agent of Erastus Rawson, of Chicago," etc., " and I continued to know him in that relation, I think, until the month of January, 1851."

In his answer to the fourth interrogatory, all that part of the answer alluding to Pease's written authority is marked, and all material, and so of the answers to the fifth and sixth interrogatories. So of the answer of Asbury G. Bozel to the third interrogatory. So of the answer of S. W. Hardin to the fifth and sixth interrogatories. All these rejected portions present such a mass of testimony material to the plaintiff's recovery that it is next to impossible a person reading it should not be influenced by it. It is not pretended the jury did not read it, but it is presumed they paid due regard to the boundary lines drawn in pencil, over which they were not permitted to pass. This is mere presumption. They could read it, and must have read it, to understand the part not rejected.

The deposition was delivered to the jury by the court, against the objections of the defendant's counsel, and, therefore, comes fully within the case from Washington's reports, above cited.

In the case of *A. Whitney* v. *C. Whitman, Jr.*, 5 Mass. R. 404, after the parties were heard, and the judge had summed up the evidence, and given the jury the necessary directions on the law of the case, when the papers were delivered to the jury, a material paper, not read in evidence, was delivered to them by mistake, which was not discovered until the jury had returned into court and delivered their verdict.

The losing party, for this cause, moved for a new trial.

On examining the paper, it appeared to the court to furnish material evidence in favor of the party prevailing, but he moved the court to examine some of the jurors, to prove that they

were not influenced by it in finding their verdict. The other party had also summoned other jurors to prove the influence. The court refused to examine any of the jurors, and observed that the court must be governed by the tendency of the paper, apparent from the face of it; that it was not pretended the jury had not read it, and it would be difficult for jurors, where, as in this case, there was much evidence of different kinds, clearly to decide in what manner their minds were influenced in forming their verdict. As it was received by the jury among other written evidence, and read by them, it must be presumed they considered it as evidence, and gave due weight to it.

As in this case, the evidence was material—was given to them—and whether it be proved it was read or not, can make no difference, as it could have been read, and was among the written evidence which had to be read.

In the case of *Shepherd* v. *Thompson*, 4 N. Hampshire R. 213, the court says: One further objection to the defendant's evidence is, that some of it went to the jury in his depositions, intermixed with testimony which was clearly incompetent, and which the court had ordered to be erased.

This objection is, in our opinion, well founded. Depositions are often taken in a manner that deserves the severest reprehension. Magistrates are often employed for the purpose who are wholly incompetent to discharge the duty; and the attorneys, under whose directions depositions are taken, not unfrequently seem to have no conception of the points in issue between the parties, and thus sheet after sheet of questions and answers are produced, nine-tenths of which are either impertinent, irrelevant or incompetent testimony. Depositions thus taken deserve no credit whatever, and ought to have no weight in the decision of a cause. And the court feels itself bound, when it has ordered improper testimony to be struck from a deposition, to hold the party to a strict compliance with the order. In this case, testimony which the court had ordered to be erased went to the jury. What weight it may have had with them we cannot say ; but we do not feel ourselves at liberty to presume that it could have no weight.

The only difference in that case and this is, that the improper testimony was ordered to be erased. Here pencil marks were drawn around it, unaccompanied by any instructions from the court to disregard the parts so marked. Fixing a slender boundary, over which, it might be well known, human curiosity would readily leap.

In *Page* v. *Wheeler*, 5 N. Hamp. R. 91, the court say, if it appeared in this case that the papers which were delivered to the jury without being read upon the trial, were designedly so de-

livered by the party who obtained the verdict, we should not stop to inquire whether the papers were material or not, but should at once set aside the verdict as a proper punishment for the misconduct of the party. In this case, as there is no evidence to the contrary, we must presume that the jury examined all the papers delivered to them. The rule seems to be, that if material papers, not read in evidence, are handed to the jury by mistake, this is a sufficient cause for granting a new trial. And it is not competent to the party who has obtained the verdict, to prove by the jury that they were not influenced by the papers in finding their verdict; but the court must be governed by the tendency of the papers, apparent from the face of them, and citing, with approbation, *Whitney* v. *Whitman*, to which we have referred.

In the case of the *Adm'r of D. Hopkinson* v. *James Steel*, 12 Vermont R. 582, the court say : " It is objected that the deposition was admitted to go into the hands of the jury, when that part of it which was actually rejected by the court was not entirely obliterated. The part rejected should be entirely erased, if the paper is admitted to go into the possession of the jury, or the admitted part may be read to the jury, and the paper withheld from their possession. But that is a matter for the counsel to attend to at the time, and if necessary, to call the attention of the court to it. But the mere fact that, through inadvertence, such a thing happened, is no error in law, no *wrong decision* of the court below, to be here assigned for error, *unless* the court below had their attention drawn to it, and actually made an illegal decision, to which exception was taken, and the same was inserted in the bill of exceptions, which is not done here," but all which is done in the case before us, and instead of its going to the jury through " inadvertence," the attention of the court was specially called to it, the objection overruled, and exception taken.

In *Wood* v. *Stewart*, 7 ib. 149, the court say, when a deposition contains matter which ought not to go to the jury, the deposition should not be delivered to them ; but the party should be permitted only to read that part which is admitted.

The case of *Warden* v. *Warden*, 22 ib. 563, cited by plaintiffs, does not conflict with any of these cases. In that case, on the trial, the plaintiff having given evidence tending to prove his case, the defendant, among other things, read in evidence, without objection, a submission of all matters in difference between the parties, and also offered, in evidence, a copy of an award made in pursuance of the submission, which was objected to by the plaintiff, and excluded by the court. The defendant also offered parol evidence to prove an award, which was objected to

by plaintiff, and excluded. The court, in charging the jury, directed them to consider the case upon the several matters of defense relied upon, aside from the submission and award, and told the jury, that the submission, not being followed by proof of any award made, constituted no defense; and the charge was not excepted to by either party. After the charge, and when the counsel was selecting the papers to be delivered to the jury, the counsel for the plaintiff objected to the submission going to the jury; but the court permitted it to be taken by the jury, with the other papers in the case; and to this the plaintiff excepted. REDFIELD, Justice, in giving the opinion of the court, says: "Any paper which should go to the jury without objections, although it should appear it might have mislead the jury, could hardly form the basis of a writ of error, the court having made no decision in regard to it. But if the paper had gone into the case by direction of the court, and at a subsequent step of the trial, the court became convinced that the paper ought not to be considered in determining the case, and should so instruct the jury, it would effectually cure the error. But the question, even, is not fairly raised in the present case, the paper having, in the first instance, gone to the jury without objection."

The jury, in this case, were expressly instructed to disregard the submission offered in evidence, but in the case at bar they were not, and the objection was made at the first moment, and persisted in.

We think, purity of jury trials—their efficiency, their power to give satisfaction whilst doing justice, will be best promoted by keeping them from temptation, from trespassing on forbidden ground for forbidden food, by withholding entirely from them all depositions, parts of which have been rejected by the court, and even those against which no objection exists, and thus prevent the party, whose case is sustained by depositions, from having an improper advantage over him whose proofs are oral only. This is equality, and equality is equity and justice.

The remaining point, that the court erred in overruling the motion for a new trial based on the affidavit of S. W. Hardin, cannot be sustained.

Hardin could have been cross-examined, even if his deposition was taken without the knowledge of the defendant. His counsel must have had notice, and, failing to file cross-interrogatories, was guilty of *laches*.

We feel sure, notwithstanding the instructions given by the court in favor of the defendant, being eight in number, that the improper evidence admitted to the jury, and the instructions given on behalf of the plaintiffs, which we have discussed, mis-

led them, in the conclusions at which they arrived, and for these errors the judgment must be reversed, the cause remanded and a *venire de novo* awarded, so that proceedings may be had in conformity to this opinion.

*Judgment reversed.*