THE BOARD OF COMMISSIONERS OF YELLOWSTONE COUNTY, APPELLANT, *v.* THE NORTHERN PACIFIC RAILROAD COMPANY AND THE BOARD OF COMMISSIONERS OF CUSTER COUNTY, BY INTERPLEADER, RESPONDENTS.

INDIAN RESERVATIONS — *Inclusion within territorial limits — Treaty.* — The Act of Congress of May 26, 1864, creating the Territory of Montana, excepted therefrom any Territory which, by treaty with any Indian tribes, was not, without the consent of said tribe, to be included within the territorial limits or jurisdiction of any State or Territory. The area of the Crow Indian reservation, as defined by the treaty of May 7, 1868, was within the boundaries of the Territory of Montana. *Held*, that said treaty being subsequent to the said Organic Act of May 26, 1864, and being silent as to the inclusion of the Crow reservation within the boundaries of the said Territory, such reservation became a part of Montana.

SAME — *Counties — Boundaries — Statutory construction.* — The United States having obtained by treaty with the Crow Indians, August 22, 1881, a portion of their reservation, being a strip of land four hundred feet wide along the southern bank of the Yellowstone River, ceded the same, July 10, 1882, to the defendant railroad company for right of way purposes, which reservation, since the division of the Territory into counties, had been within Custer County. The Act of February 26, 1883, created Yellowstone County out of a portion of Custer County, and by the amendment of March 5, 1885, provided that a portion of said reservation, embracing the strip in question, "that may hereafter be segregated and thrown open to settlement, shall form a part of Yellowstone County," and "is hereby attached to Yellowstone County for judicial purposes." *Held*, that said amendment could not be construed to have removed said strip from Custer County, said strip having been segregated prior to the amendment.

TAXATION — *Judicial purposes.* — The power to tax is not a judicial power, and the attaching of certain territory to a designated county for "judicial purposes" does not give such county the right to tax the same.

*Appeal from Seventh Judicial District, Yellowstone County.*

Judgment was rendered for the defendant by MILBURN, J.

*Jas. R. Goss,* and *Toole & Wallace,* for Appellant.

*Strevell & Porter,* for Respondents.

DE WITT, J. — This action was originally against the Northern Pacific Railroad Company for taxes; but the county of Custer was interpleaded, and the contention is now between the two counties as to the right to collect the tax from the company. The railroad company is a disinterested party, and has paid the money into court, to await the decision of this case. It is not necessary, to an intelligent view of the case, to review the pleadings. The case is properly before this court. The tax in question, $1,531.25, was levied by each county upon the property of the Northern Pacific Railroad Company, situated upon a strip of land, the right of way of the company, 400 feet wide, and extending westwardly from the crossing of the railroad over the Big Horn River to the crossing over the Yellowstone River, near the town of Billings, which is land ceded by the Crow Indians from their reservation to the United States, and by the latter granted to the railroad company for right of way purposes. The geographical position and relation of this strip of land to the two counties and the Crow Indian reservation is made clear by the accompanying plat. [See p. 416.]

The only question before the court is, as to what county has jurisdiction to tax the property within this strip. The District Court decided in favor of Custer County, from which judgment Yellowstone County appeals.

This controversy arose in the year 1889, under the territorial government of Montana. It is necessary to give a short historical review. The act of Congress creating the Territory (May 26, 1864) included within its boundaries the whole of what is now the Crow Indian reservation, and the counties of Custer and Yellowstone, and the strip of land in question. As to Indians, that act provided: "That nothing in this act contained shall be construed to impair the rights of person or property now pertaining to the Indians in said Territory, so

long as such rights shall remain unextinguished by treaty
between the United States and such Indians, or to include any
territory which, by treaty with any Indian tribes, is not, with-
out the consent of said tribe, to be included within the terri-
torial limits or jurisdiction of any State or Territory; but all
such territory shall be excepted out of the boundaries, and con-
stitute no part of the Territory of Montana, until such tribe
shall signify their assent to the President of the United States
to be included within said Territory." (13 U. S. Stats. at
Large, p. 86, § 1.)

In examining the relations of the Crow Indians and the
United States government, we find that on May 26, 1864, the
date of said act, there was not within the limits of the Terri-
tory of Montana, so created, any land, as to which it had been
provided by treaty with the Crow Indians that it should not
be included within the territorial limits or jurisdiction of any
State or Territory. The treaty with the Crows of February
6, 1826, is one only of amity and commerce. In it, no land
in the United States is set apart for their use and occupation.
No land within the limits of what became the Territory of
Montana is so set apart for them until the treaty of May 7,
1868, which was subsequent to the Act of Congress of May
26, 1864, from which we have above quoted a portion of section
1. This latter treaty "set apart for the absolute and undis-
turbed use and occupation" of the Crow Indians a tract of
land, bounded on the east by the one hundred and seventh
meridian, on the south by the forty-fifth degree of latitude,
which was the southern boundary of Montana, on the north by
the mid-channel of the Yellowstone River, and on the west by
a line west of the strip of ground in controversy in this action.
This whole area was within the then organized Territory of
Montana, and included within itself this strip of land, which
afterwards became the right of way of the Northern Pacific
Railroad Company. This latter treaty of May 7, 1868, being
subsequent to the act organizing the Territory of Montana, and
defining the limits thereof, and placing this area in question
within those limits, and the treaty of May 7, 1868, being abso-
lutely silent on the question of any rights or claims of the
Crow Indians to have or not to have their reservation included

within the boundaries of said Territory theretofore organized as above described, we conclude that the territory of the Crow Indian reservation became and was and is a part of Montana.

The territorial government, thus having within its boundaries a vast area, proceeded to divide it into counties. It created the counties of Missoula, Deer Lodge, Beaverhead, Madison, Jefferson, Edgerton (afterwards Lewis and Clarke), Gallatin, and Choteau. (Act February 2, 1865, 1 Sess. Bannack Laws, p. 528.) This act specifically defined the limits of each of said counties, by mountain ranges, rivers, and other natural objects and meridians of longitude and degrees of latitude. These lines left wholly without the limits of said defined counties a great district in the eastern part of the Territory, as to which country the act provided (§ 9) as follows: "That all the remaining portion of the Territory of Montana not included in the counties before named in this act, be, and the same is hereby, created a county, to be known as Big Horn County, and shall be attached for legislative and judicial purposes to the county of Gallatin." This residuum of territory, created as and called Big Horn County, included what is now the counties of Custer and Yellowstone and the Crow Indian reservation. For the purposes of this review, the situation remained the same in the Codified Statutes, 1871–72, page 432. By Act of February 16, 1877 (10th Sess. p. 425), the legislature changed the name of Big Horn County to Custer County, in honor of the gallant soldier who had just fallen in defense of her people. In February, 1879, by an act which became a law without the governor's approval (11th Sess. p. 100), courts were created, and the county seat named "Miles" (not Miles City), in honor of another soldier distinguished in her history. The strip of land was still within Custer County, and remained so, when the Act of February 26, 1883 (Comp. Stats. p. 839, § 742), created the county of Yellowstone, partly from what had been Custer County. It is sufficient to say of its boundaries, that the southerly one was "the center of the channel of the Yellowstone River." The strip of land now in question lies wholly south of the Yellowstone River, and parallel, or nearly so, to the said southerly boundary of Yellowstone County, created as above described. Let it be remembered that the northerly

boundary of the Crow Indian reservation was the mid-channel of the Yellowstone River. On March 5, 1885 (Comp. Stats. p. 840), the following amendment to the above act was passed: "That all that portion of the Crow Indian reservation lying between the Wyoming line and the Yellowstone River, and west of the Big Horn River, in Montana Territory, that may hereafter be segregated and thrown open to settlement, shall form a part of Yellowstone County. All that portion of the Crow Indian reservation above described is hereby attached to Yellowstone County for judicial purposes." In this whole history of Yellowstone and Custer counties, the parties to this action, we can find no act of the legislature which took any of this country south of the Yellowstone River out of Custer County, or placed it in Yellowstone County, unless such intent can be construed out of the amendment last mentioned. To this we will return later.

We turn aside to observe the extinguishment of the Crow Indian title to the strip of land under discussion. On August 22, 1881 (22 U. S. Stats. at Large, p. 157), by treaty between the Crow Indians and the United States, the former ceded to the latter "a strip of land not exceeding 400 feet in width, that is to say, 200 feet on each side of the line laid down on the map of definite location hereinbefore mentioned (the Northern Pacific Railroad line), wherever said line runs through said reservation between the one hundred and seventh degree of longitude west of Greenwich on the east, and the mid-channel of the Big Boulder River on the west, containing 5,384 acres, more or less. This western boundary of the Big Boulder River is west of the western boundary of the strip in question at the crossing of the Yellowstone River near the town of Billings, hereinbefore described. By Act of Congress of July 10, 1882, right of way for railroad purposes over this strip of land was granted by the United States to the Northern Pacific Railroad Company, the original defendant in this action, before the interpleader of the county of Custer. Thus the Indian title was extinguished, and the land belongs to the county of Custer, or the county of Yellowstone, or, rather, which county has the right of taxation upon said strip, is the question presented to this court.

This narrow ribbon of territory is certainly a portion of the county of Custer. It was, as has been seen, first placed within Custer County, and has never been taken out. This seems beyond controversy. It is equally clear that Custer County has the exclusive right to tax the property of the Northern Pacific Railroad Company upon said land, unless the Amendatory Act of March 5, 1885 (Comp. Stats. p. 840), confers that right upon Yellowstone County. The only argument for this position that we have discovered is that this territory is attached to Yellowstone County for judicial purposes. What are "judicial purposes?" Webster's Dictionary defines the word "judicial" as "pertaining or appropriate to courts of justice, or to a judge thereof; as, judicial power; a judicial mind. Practiced or employed in the administration of justice; as, judicial proceedings. Proceeding from a court of justice; as, a judicial determination; ordered by a court; as, a judicial sale." The Century Dictionary, the most thorough English lexicon of which we have any knowledge, devotes a large space to the definition of the word "judicial." Among other things it says: "Of, or belonging to a court of justice; of, or pertaining to a judge; pertaining to the administration of justice, proper to a court of law; consisting of or resulting from legal inquiry or judgment, as judicial power, or proceedings; a judicial decision, writ, sale, or punishment; determinative; giving judgment. Judicial act, an act involving the exercise of judicial power." This excellent work defines the word "judicial" in connection with many words and expressions with which it is used, and invaribly in the sense above indicated. It refers to the *Sinking Fund Cases*, 99 U. S., in which Justice Field says (p. 761): "The distinction between a judicial and a legislative act is well defined. The one determines what the law is, and what the rights of parties are, with reference to transactions already had; the other prescribes what the law shall be in future cases arising under it. Whenever an act undertakes to determine a question of right or obligation, or of property, as the foundation upon which it proceeds, such act is to that extent a judicial one." Bouvier's Law Dictionary does not define the adjective "judicial" separately, but treats of it used in connection with a dozen other words, and the whole tenor of definition is so

completely in line with what we have already quoted that it is useless to cite further.

We cannot doubt, in view of the meaning of the word "judicial," that the expression "judicial purposes," as used in the statute, which we are endeavoring to construe, means purposes of the courts and the administration of justice. Taxation certainly does not pertain to the affairs of courts and the administration of justice. Judicial, legislative, and executive affairs are very distinctly separated throughout the whole history and policy of American law and government. Their provinces are well defined, and their boundaries sharply drawn. The legislature must have had this in mind when they attached the old county of Big Horn to Gallatin County "for legislative and judicial purposes." (Cod. Stats. 1871–72, p. 432, § 11.) Thus, legislative and judicial purposes are expressed and executive purposes are excluded. Thirteen years later (Act March 5, 1885), when we. come to the attachment of this portion of the Crow Indian reservation to Yellowstone County, judicial purposes alone are expressed, and both legislative and executive are excluded. There seems here to be an application of the maxim, *Expressio unius, exclusio alterius.* If the legislature had intended to include executive purposes, revenue, and taxation, they would have so expressed themselves. Their silence is significant.

The use of the word "judicial" in other portions of the laws of Montana indicate its meaning. Section 531 of the Code of Civil Procedure provides that no judicial business shall be done on Sunday, etc., except, — and then goes on to recite a large number of acts and classes of business, which pertain solely to courts and the affairs of courts. Sections 698 and 699 of the Code of Civil Procedure define judicial districts, and then treat of the courts therein. Again, observe that the Act of March 5, 1885, provides that portions of the Crow reservation, which shall *hereafter* be segregated and thrown open for settlement, shall form a part of Yellowstone County. But this strip of land in question had been segregated three years prior to this act. If the legislature intended to place this strip in Yellowstone County, why did they confine the operation of the act to only those portions thereafter segregated. The whole spirit of

these laws, and the history of events, and the common as well as the legal understanding of words, lead irresistibly to the conclusion, which we have held from the commencement of the investigation, that this portion of territory belongs to Custer County for the purposes of taxation.

We have indulged in this otherwise unnecessarily voluminous discussion of what has always seemed to us a very clear proposition, by reason of the manifest injustice which this condition of affairs works upon Yellowstone County, and our desire to find some remedy for this injustice. Custer County, otherwise compact in form, stretches out over its neighbor a shoe-string district, 105 miles long and 400 feet wide. Custer County takes the fruits of the land, in the way of taxes, and leaves to Yellowstone the labor and expenses of maintenance. This injustice is so glaring and absurd that it demands immediate legislative remedy. That remedy is not at the hand of this court; and we can do nothing but affirm the judgment of the District Court, which is accordingly done.

BLAKE, C. J., and HARWOOD, J., concur.