JAMES A. DUNN

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Opinion filed April 21, 1898.*

1. DYING DECLARATIONS—*written dying declarations do not preclude other oral ones.* Where a dying declaration is reduced to writing and signed by the declarant the writing is the best evidence of such declaration; but the fact that a dying declaration has been reduced to writing does not preclude evidence of oral dying declarations made at other times.

2. SAME—*proof not restricted to single dying declaration.* In criminal prosecutions the People are not restricted to proof of a single dying declaration, but such declarations, if otherwise admissible, may be proved as made from time to time.

3. CRIMINAL LAW—*section 55 of Practice act applies to civil cases only.* Section 55 of the Practice act, (Rev. Stat. 1874, p. 781,) which provides that papers read in evidence, other than depositions, may be taken by the jury upon retirement, is applicable to civil cases only.

4. SAME—*procedure in criminal cases is governed by division 13 of the Criminal Code.* The mode of procedure in criminal prosecutions is governed by division 13 of the Criminal Code, section 8 of which provides that trials for criminal offenses shall be conducted as at common law, except as otherwise provided by the code.

5. SAME—*what papers may be taken by jury is determined by the court.* Following the common law rule, the jury, in criminal cases, may, upon retirement, take such books and papers which have been produced in evidence as the trial judge, in the exercise of sound discretion, shall direct.

6. SAME—*when permitting jury to take paper is an abuse of court's discretion.* Permitting the jury, upon retirement, to take a written dying declaration against the defendant is an abuse of the trial court's discretion, where the defendant's evidence was oral, only, and contradictory of the declaration, which constituted the principal evidence against him, and where the declaration contained

passages in brackets which the court has ruled as inadmissible, though the jury were orally directed not to consider them.

7. SAME—*admissibility of statements to impeach dying declaration in prosecution for producing an abortion.* A dying declaration against a defendant indicted for furnishing a drug to the deceased to produce an abortion may be impeached by contradictory statements, made by the deceased either before or after the abortion, even though such contradictory statements were not made *in extremis.*

8. TRIAL—*court should use great discretion in propounding questions to witnesses.* Though within the power of the trial judge, in criminal cases, to propound pertinent and properly framed questions to a witness, yet the examination of witnesses is the more appropriate function of counsel, and instances are rare and the conditions exceptional which will justify the trial judge in conducting an extended examination of a witness, and a sound discretion will seldom deem such course advisable.

9. SAME—*objections by counsel to questions propounded by court should specify grounds thereof.* The action of the trial court in propounding questions to witnesses will not be reviewed on appeal, nor the record consulted to determine whether such questions were leading or suggestive, where the objections by counsel fail to specify the grounds thereof, being merely general in character.

10. INSTRUCTIONS—*when instructions are prejudicial.* Instructions which take from the jury the controverted question whether the accused furnished a certain drug to the deceased which produced an abortion resulting in her death, as charged by her dying declaration, and which invite them to find the accused guilty although they believe some other person committed the crime, provided they believe the accused advised or encouraged it, are prejudicial, where there is no evidence of the latter condition of affairs.

WRIT OF ERROR to the Circuit Court of Pike county; the Hon. JEFFERSON ORR, Judge, presiding.

W. E. WILLIAMS, and W. H. CROW, for plaintiff in error:

When dying declarations have been reduced to writing, parol evidence of the declaration is not admissible. Where the declarations had been repeated at different times, at one of which they were made under oath and at others they were not, parol evidence is not admissible if the written declaration can be produced. 1 Greenleaf on Evidence, sec. 161; Wharton on Crim. Evidence, sec. 295; Underhill on Evidence, sec. 103; *State* v. *Sullivan,* 51 Iowa,

142; *State* v. *Tweedy*, 11 id. 350; *People* v. *Glenn*, 10 Cal. 32; *Collier* v. *State*, 20 Ark. 36; *State* v. *Patterson*, 45 Vt. 308.

Dying declarations are admissible only from the necessity of the case, and are therefore properly restricted to the identification of the prisoner and the deceased, and to the act, and circumstances immediately attending said act and forming a part of the *res gestœ*. When they relate to former or subsequent distinct transactions, and embrace facts or circumstances not immediately illustrating or connected with the declarant's death, they are inadmissible. *State* v. *Vanzant*, 80 Mo. 67; *State* v. *Draper*, 65 id. 335; *Collins* v. *Commonwealth*, 12 Bush, 271; *State* v. *Wood*, 53 Vt. 560; 6 Am. & Eng. Ency. of Law, 123, and authorities cited.

What occurs before and after the act has been done does not constitute a part of the *res gestœ* although the interval of separation may be very brief, and is not the subject of proof by dying declarations. *Field* v. *State*, 57 Miss. 474; *Montgomery* v. *State*, 80 Ind. 338.

A written dying declaration is equivalent to a deposition regularly taken under the same circumstances, the sense of impending death being regarded as equivalent to an oath duly administered. Depositions should not be permitted to be taken by the jury in their retirement, and if so taken over the objections of the unsuccessful party is ground for reversal. *Rawson* v. *Curtiss*, 19 Ill. 456; *Smith* v. *Wise*, 53 id. 141.

Dying declarations are secondary or hearsay evidence, and not entitled to the same weight as though the deceased had testified as a witness. Declarations of this character should be received with the greatest caution. 6 Am. & Eng. Ency. of Law, 135; *State* v. *Vanzant*, 80 Mo. 67; *Lambert* v. *State*, 23 Miss. 322; *People* v. *Knapp*, 1 Edm. Sel. Cas. 177; *People* v. *Lawrence*, 21 Cal. 368; *State* v. *Dickson*, 41 Wis. 299.

Dying declarations may be impeached by proof of contradictory statements made not *in extremis* and not a

part of *res gestœ.    Moredock* v. *State*, 90 Tenn. 528; *Fielder*
v. *State*, 23 Tex. App. 477; *People* v. *Lawrence*, 21 Cal. 368.

A woman who co-operates, vóluntarily and deliber-
ately, with another to produce an abortion upon herself
is an accomplice, and her evidence should be tested and
weighed as that of any other accomplice.    Wharton on
Crim. Evidence, sec. 440; *Smith* v. *State*, 37 Ark. 274; *Peo-
ple* v. *Josslyn*, 39 Cal. 393.

Hypothetical questions must present facts which the
evidence tends to prove.    However, it is not necessary
that such questions should embody all the facts exhibited
by the evidence. *Williams* v. *Brown*, 28 Ohio St. 547; *Bum-
gardner* v. *Andrews*, 55 Iowa, 638; *Goodwin* v. *State*, 96 Ind.
550; *Hathaway* v. *Insurance Co.* 48 Vt. 336; *Elliott* v. *Russell*,
92 Ind. 526; *Davis* v. *State*, 35 id. 496.

Any remark calculated to prejudice the jury, or an
expression of opinion by the judge in the hearing of the
jury, has been held ground for reversing the judgment.
*State* v. *Harkin*, 7 Nev. 377; *McMinn* v. *Whelan*, 27 Cal. 300;
*Furham* v. *Mayor*, 54 Ala. 263; *Ludden* v. *Clemons*, 16 Neb.
506; *Hayes* v. *State*, 58 Ga. 35; *Wilkinson* v. *Searcy*, 76 Ala.
176; *Hair* v. *Little*, 28 id. 236; *Andrews* v. *Ketcham*, 77 Ill.
377; *State* v. *Simmons*, 6 Jones' L. 21; *Reiger* v. *Davis*, 67
N. C. 185.

WILLIAM MUMFORD, and EDWIN JOHNSTON, for the
People:

An abortion which results in the death of the woman
is murder at the common law.    Bishop on Stat. Crimes,
sec. 742; *State* v. *Dickinson*, 2 Am. Cr. 1.

The woman's consent to the abortion furnishes no
defense whatever. 1 Bishop on Crim. Law, secs. 257, 259;
Bishop on Stat. Crimes, sec. 749;  1 Wharton on Crim.
Law, secs. 450, 451.

If the act of the defendant contributed to the abortion
he is guilty of all. 8 Am. Cr. 572; Bishop on Stat. Crimes,
sec. 759; 1 Greenleaf on Evidence, 139.

Dying declarations are admissible as to those facts to which the witness might testify if living. Parol evidence will not be received of a dying declaration that has been reduced to writing, but where several are made, the oral ones may be shown when he cannot produce the written one. Wharton on Crim. Evidence, secs. 276, 301; Am. Law of Homicide, 306, *et seq.*

The dying declaration may be to all the circumstances attending the fatal occurrence, and may be to all relevant matters to which the declarant, if living, might testify. *People* v. *Knapp,* 1 Cr. Lr. 255.

Preliminary proof of dying declaration may properly be taken in the presence of the jury. *North* v. *People,* 139 Ill. 81.

Where the instructions as a whole present the law, there will be no reversal. *Lockwood* v. *Doane,* 107 Ill. 235.

When the evidence clearly sustains the verdict, this court never reverses for error in instructions. *Young* v. *McConnell,* 110 Ill. 83.

Mr. JUSTICE BOGGS delivered the opinion of the court:

At the November term, 1896, of the Pike circuit court an indictment was returned by the grand jury charging the plaintiff in error with the murder of one Alice Grimes. At the April term, 1897, of the said circuit court the cause was tried and the plaintiff in error adjudged to be guilty of the charge alleged in the indictment, and his punishment fixed at confinement in the penitentiary for a term of fourteen years. This is a writ of error brought to reverse the judgment of conviction.

The theory of the prosecution was that the said Alice Grimes became pregnant with child, and that the plaintiff in error, with intent to produce a criminal abortion, supplied her with and induced her to take repeated large doses of calomel; that the effect of the administration of the said drug caused a miscarriage, and that said Alice Grimes died as the result thereof. The death of said

Alice Grimes was fully proven. The evidence that calomel was furnished by the plaintiff in error to her consisted wholly of her dying declarations, nor was there any proof that he advised or counseled her to use calomel, other than such declarations. The proof as to her pregnancy and that an abortion was produced was her dying statements, together with proof of circumstances which the People insist are corroborative upon the point.

The circuit court ruled that the deceased was in such condition, physically and mentally, for a period of seven days prior to her death, that statements made by her were admissible in evidence as dying declarations. Witnesses were produced and allowed to testify to declarations made by her in their presence on four different days, and proof was also made that statements made by her on still another day were reduced to writing and signed by her, and this written statement was produced and read in evidence to the jury. The plaintiff in error objected to the admission of the oral dying declarations on the ground that where such declarations have been repeated at different times, and at one of which times such statements were reduced to writing, only the written statement is admissible in evidence. The court overruled the objection and the plaintiff in error excepted, and now urges the ruling of the court as error. The rule, as we understand it to be, is, if the dying statements are reduced to writing and signed by the declarant, the writing is the best evidence of the statement made at that time, and must be produced or its absence accounted for, but that the fact that a declaration has been reduced to writing will not preclude evidence of unwritten declarations made on other occasions. Wharton on Crim. Evidence, sec. 295; Bishop on Crim. Proc. sec. 1213; Hochheimer on Crimes, sec. 184; McClain on Crim. Law, sec. 429, and authorities cited in note *g*.

Nor is the contention of plaintiff in error tenable that the People are restricted to proof of declarations made

on one occasion, only. Such statements, if otherwise admissible, may be proven as made from time to time.

When the jury retired to consider of their verdict, the court, over the objections of the plaintiff in error, permitted the jury to take the written dying declarations into the jury room for their consideration, and this action of the court is urged as error. Section 55 of the Practice act, (Rev. Stat. 1874, p. 781,) which provides that papers read in evidence, other than depositions, may be taken by the jury upon their retirement, is applicable only to civil cases. The mode of procedure to be observed in the trial of criminal cases is governed by the provisions of division 13 of the Criminal Code. (Rev. Stat. p. 409.) The eighth section of the division (1 Starr & Curtis' Stat. 1896, par. 612, p. 1400,) provides that all trials for criminal offenses shall be conducted according to the course of the common law, except when the Criminal Code points out a different mode. Nothing in the said division of the Criminal Code purports to direct what shall be taken by the jury from the bar of the court. The common law rule in criminal cases was, that the jury, when they retired to deliberate on their verdict, should take with them such books and papers which had been produced in evidence as the judge presiding should direct. (1 Bishop on Crim. Proc.—3d ed.—sec. 982 a; Hochheimer on Crimes, sec. 250.) Whether a writing introduced in evidence in a criminal case should be delivered to the jury to be consulted by them in the jury room, rests in the sound discretion and judgment of the court, and it is therefore not error to permit a jury to take a written statement, unless the reviewing court can say that such course was prejudicial to the defendant, and ought not, in the exercise of sound discretion and judgment, have been pursued. The written statement in question assimilated so nearly to a deposition, that all of the reasons which have by text writers and courts been advanced in support of the view that depositions should not be taken by a jury in their retire-

ment, may well be invoked as reasons why this statement should not have been allowed to go into the jury room.

In *Rawson* v. *Curtiss*, 19 Ill. 456, (which was decided prior to the enactment of the section of the Practice act which excludes depositions from the jury when in their retirement) Mr. Justice BREESE, after forcibly stating the injustice of allowing written testimony to be taken into the jury room, declared that the practice of permitting depositions to be taken out by the jury, either with or without the direction of the court, was wrong in practice and should be abolished. This remark of the court applies with greater force to dying declarations than to depositions regularly and lawfully taken, because when a deposition is taken, ample opportunity is given the adverse party to appear and cross-examine the witness, and thereby expose any errors, bring out suppressed facts which would weaken or qualify the statement, test the truthfulness, recollection and fairness of the witness and aid to determine as to the truth of his statements, while no such opportunity is permitted when a dying declaration is reduced to writing. In the case at bar, dying declarations of the deceased, made on four occasions other than when the written statement was signed, were reproduced by witnesses for the State before the jury. The written statement was read in their hearing. They heard no evidence on the part of the plaintiff in error except such as was testified to by witnesses in their presence, and the testimony so produced in behalf of the plaintiff in error was in direct conflict with material portions of the dying declarations. To deliver the written statement to the jury so they might have it constantly before them during their deliberations, to operate on their sympathies as well as their memory, tended to give a manifest advantage to the People over the plaintiff in error, whose proof was but oral. No reason is suggested, nor is any perceived, why the one party should have thus been given an advantage over the other.

The circuit court ruled that certain portions of the written statement were not admissible in evidence and not competent for the jury to consider, and ordered these portions to be marked, and orally announced the jury should not consider such marked phrases. It appears from the record these incompetent phrases or words were so marked by being enclosed with brackets. A similar course was pursued with reference to depositions which the court permitted the jury to take with them in their retirement in the case of *Rawson* v. *Curtiss, supra,* and in the course of the criticism upon such practice this court said (p. 481): "The jury may, or may not, have disregarded the marked portions. This cannot be known certainly, as there is no proof to the point, but it is certainly apparent that they had no other instructions. They were not told, in express terms, to disregard them. Even had they been thus told, such is our nature that by the very command not to regard them curiosity would be aroused to know what they were; what secret it is the court designs to hide from them; what tree of knowledge of good and evil, the fruit of which is forbidden to us, and, like their first parents in God's own garden planted for them, they would pluck and eat. It is human nature, and mountains of instructions could not crush it out. Reading and pondering these rejected portions, and reasoning with one another why they should have been excluded, their minds would naturally be impressed by them, and they unconsciously form conclusions from the rejected evidence. Few know the secret and insidious manner by which impressions are made on the mind, or how slight the operating cause may be." We think that a sound discriminating discretion was not exercised in the matter of permitting the written statement to be taken by the jury when they retired to consider, weigh and determine the testimony.

The case as relied upon by the People, the proof thereof being the dying declarations aforesaid, was that

the plaintiff in error, late in the afternoon on the 2d day of July, 1896, gave to the deceased a quantity of calomel, and directed her to take the same for the purpose of procuring an abortion; that she took two doses of the calomel on the same day.   That an abortion occurred on the 19th day of July is claimed to have been established by the dying statements of the deceased and other testimony in corroboration upon that point.   The plaintiff in error was produced as a witness in his own behalf, and among other things testified that he had a conversation with the deceased on the 11th day of July, 1896, in front of a barber shop in the village of Nebo, and a second conversation at his store in the village on the 20th day of the same month, and his counsel propounded to him certain questions for the purpose of bringing out statements and declarations which he alleged the deceased made to him during said conversations contradictory of material portions of the alleged dying declarations.   The court ruled such declarations were not admissible in evidence, and in so ruling made, in the hearing and presence of the jury, the following remarks: "That is not only objectionable, but it ought not to be repeated before the jury.   Such evidence won't do.   If conversations conceived in the fertile mind of a defendant can be admitted when the woman is dead and cannot refute it, it would render convictions in this class of cases impossible."   Counsel for plaintiff in error objected and excepted to the ruling and remarks of the court.

It is well settled that dying declarations may be impeached by proof of contradictory statements on material points, though such contradictory statements were not made *in extremis.*   Bishop on Crim. Proc. sec. 1209; Wharton on Crim. Evidence, sec. 298; McClain on Crim. Law, sec. 431; Hochheimer on Crimes, 184.

After the evidence for the plaintiff in error (the defendant below) had been submitted and the rebuttal evidence for the People introduced, the court announced

that the plaintiff in error might be recalled and allowed to testify as to the statements of the said deceased in front of the barber shop on the 11th day of July, and that conversation was testified to, but the court again refused to allow the plaintiff in error to introduce testimony as to the statements of the deceased in the store on the 20th day of July.

When the question as to the admissibility of the alleged statements of the deceased to the plaintiff on the 20th day of July was before the court, but after the court had made the remark hereinbefore set out, it was ordered the jury be withdrawn, and the plaintiff in error, in the absence of the jury, detailed to the court the conversation which he alleged occurred between himself and the said deceased in his store while other parties, namely, Asa Gheen and Mrs. Pinkerton, were in the store. As to that the plaintiff in error testified as follows:

The court: "What did you say she said to you on the 20th of July?

A. "She came up to the store and she said, 'I am as independent now as you are.' I said, 'I thought you was always as independent as I was.' She said, 'I miscarried this morning.' I said, 'Yes, I expect you did.' She said, 'I did.' I said, 'I guess you didn't, did you?' She said, 'Yes, I did.' I said, 'Alice, I know better than that; I know you wouldn't be out here in this mud and wet and rain if you had done anything of that kind.' She said, 'Well, I did.' I said, 'My Lord! girl, ain't you got more sense than that?' She said, 'Oh! it won't hurt me.' I said, 'It will.' Then she wanted to know if I wouldn't take her home after lodge. I said no, I wouldn't go that night for five dollars, the kind of a night it was. She said, 'You would if Maude Smith or Mollie Johnson wanted you to.' She said, 'I told you all the time I was in a family way, and you wouldn't believe it.' I said, 'Alice, if you are telling me the truth, for God's sake go and see a doctor and go home.' She said, 'There is nothing the matter

with me now, only falling of the womb.' I told her to go and see a doctor, and she said no. I said, 'You will kill yourself in this rain.' Just at that time Dr. Pollock stepped in the drug store with a chair.

Q. "What was said in the store while Asa Gheen and Mrs. Pinkerton was there?

A. "She said to me, 'You don't care anything for me,' or something of that kind. I said, 'Why certainly I do.' She said, 'Why don't you take me home?' I said, 'Alice, if you don't quit going with 'Babe' Graham I won't have anything to do with you.' She said, 'Babe Graham is a devilish sight better than you are.' She said, 'When I was in trouble you were not willing to help me and Babe Graham did.' I said, 'How did that come?' She said, 'When I was in trouble you would not help me.' I said, 'Alice, what is the use of saying that? Did I not offer you the money to go wherever you wanted to?' She said, 'You knew I could not go away, and would not have offered me the money if you thought I would.'"

These alleged statements of the deceased, if true, were inconsistent with the alleged dying declarations in more than one material point. It was fairly to be inferred from the statements so testified to by the plaintiff in error that the abortion, if any occurred, was produced without the knowledge or participation of the plaintiff in error, and that one Babe Graham was the person who assisted and participated in effecting the abortion.

The argument of counsel for the People is, that the conversation in question was properly excluded because (1) it was had after the abortion, and (2) that the alleged statement of the deceased that Babe Graham helped her out of her trouble may have had reference to some other trouble not connected with her pregnancy. We know of no rule restricting the plaintiff in error to the proof of contradictory statements made prior to the abortion, nor do we perceive any reason for the adoption of such a rule. The other objections to the admission of the statements

17:—38

must be overruled for the reason the evidence tended to show the "trouble" referred to was the alleged abortion, and it became thereupon the duty of the court to permit the jury to receive and consider the testimony. It was error to refuse to allow plaintiff in error to introduce proof of the excluded alleged statements.

The expressions of the court in ruling that such evidence should be excluded is also assigned as prejudicial error by the plaintiff in error,—and in this same connection we may consider the complaints of the plaintiff in error that the court improperly undertook to examine and cross-examine different witnesses presented by the respective parties, and asked improper and leading questions of such witnesses. The court propounded a number of interrogatories to Malissa Grimes, the mother of the deceased, and to Mrs. Couch, in the examination of said witnesses in chief for the People, and in the re-direct examination of Mrs. Grimes, and to the plaintiff in error upon cross-examination. The plaintiff in error objected to thirteen of the questions so framed by the court, and, the objections being overruled, preserved exceptions. The court determined it was admissible to prove certain declarations of the deceased as dying declarations, and Mrs. Grimes and Mrs. Couch were introduced as witnesses to detail such declarations. During the course of their examination upon this subject the court propounded to them a number of questions which counsel for plaintiff in error objected and excepted to, and in his brief argues were objectionable on the alleged ground they were leading and suggestive. The court also propounded a number of questions to the plaintiff in error on cross-examination. The ground of the objections and the exceptions to these questions do not appear from the bill of exceptions, but the argument of counsel for plaintiff in error in support of the objections is, "the questions were leading, and that the tone and manner of the court when making the interrogations to all the witnesses was prejudicial, and the

course pursued by the court in examining at length so many witnesses was unusual and tended to the injury of his cause."

It is within the power of the court to propound pertinent and properly framed questions to a witness. The exercise of the power, if the questions propounded by the court are directed to crucial points of the case, is most likely to arouse the serious apprehension of the one or the other of the parties, and certainly places counsel in a situation of great embarrassment if they conceive a question asked by the court is leading and suggestive in form or improper for any cause. It is a task of great delicacy and much difficulty for a presiding judge to so conduct the examination of a witness that nothing, in either the tone or inflection of the voice, the play of the features, the manner of propounding or framing the question, or the course of investigation pursued in the examination, will indicate to the jury the trend of the mind of the questioner. An extended examination of a witness by the court must be unfair unless it partakes partly of the nature of a cross-examination, and though great skill and tact and perfect fairness be employed, there is much danger the impression or opinion of the court as to the truthfulness, candor and reliability of the witness and as to the weight and value of his testimony will be manifested to the jury. Though at times the court may, by an opportune and carefully considered question, elucidate a point, aid an embarrassed witness or facilitate the progress of a trial without in any degree influencing the jury or arousing distrust in the minds of the parties or their attorneys, yet the examination of witnesses is the more appropriate function of counsel, and it is believed the instances are rare and the conditions exceptional in a high degree which will justify the presiding judge in entering upon and conducting an extended examination of a witness, and that the exercise of a sound discretion will seldom deem such action necessary or

advisable. We must, however, decline to consult the record or consider the form of the questions excepted to in order to determine whether they are leading or suggestive, as claimed, for the reason the objections made to the questions did not specify the grounds thereof, being only general in character.

The observations of the judge made in the presence and hearing of the jury when ruling that it was not competent to permit the plaintiff in error to testify to conversations alleged to have been had with the deceased, in which plaintiff in error contended that the deceased made statements contradictory to the alleged dying statements, were manifestly prejudicial to the cause of the plaintiff in error. The jury could but imply from the remarks of the court that it was the opinion of the court the testimony of the plaintiff in error (which was afterwards admitted) that the deceased had made such alleged statements in a conversation with him were but the conceptions of the fertile mind of the plaintiff in error, and consequently had no basis in truth or in fact, and it may well be feared the jury would further imply that in the opinion of the court the plaintiff in error was presenting a fabricated defense throughout. The plaintiff in error was a competent witness, and the jury were the sole judges of the weight and credit which ought to be given to his testimony. He was entitled to a decision by the jury on the facts, uninfluenced by the opinion of the judge. In *Andreas* v. *Ketcham,* 77 Ill. 377, we said (p. 379): "The opinion of the judge, given, as it was, before the jury, upon a question of fact which was controverted, could not do otherwise than prejudice the jury against appellants. The laws guarantee to all a fair and impartial trial, and courts are organized for the purpose of seeing that the laws are administered in such a manner that justice will be done to all. In cases where the jury have the sole power to determine questions of fact from the evidence, the law cannot be properly administered and

justice done parties in litigation if the judge presiding, after the evidence is closed, gives to the jury his own opinion on a question of fact."

We think the court erred also in its rulings upon the instructions asked and given on behalf of the People. The indictment contained five counts. The charge in the first and third is that the abortion and death were produced by the use of calomel, and in the second and fourth it is alleged that a noxious drug, the name whereof was unknown to the jurors, was used, and the charge of the fifth count is that the abortion was accomplished "by divers means then and there by the said James A. Dunn used and employed, the name and character of which divers means are to the jurors unknown." There was no proof tending to show any drug other than calomel was used. The only proof that plaintiff in error furnished calomel to the deceased consisted, as we have hereinbefore said, of the alleged dying declaration of the deceased. The plaintiff in error was engaged in business as a retail merchant in the village of Nebo, and in connection therewith drove a trading or huckster's wagon through the country in the vicinity of Nebo at regular intervals. The deceased had her home with her mother, about three miles east of Nebo. Her dying declarations were that plaintiff in error, while on one of his trading trips on the second day of July, 1896, late in the afternoon of that day stopped at a gate which led from the public road to the home of the deceased, and then and there gave her a package of calomel and directed her to take it in certain specified doses, and assured her it would produce a miscarriage; that she took the drug as directed, and that an abortion and her fatal illness followed. There was no proof, nor any attempt to prove, that the plaintiff in error used or attempted to use any other drug than calomel, or that he furnished any calomel at any other time or place than on the afternoon of the said second day of July in the public road near the said gate,

and there was no proof whatever that he endeavored to accomplish the abortion by any other means, of any nature or character, other than by the alleged use of said calomel, or that he in any other way than that aided, advised or encouraged the said deceased to bring about the miscarriage.

The plaintiff in error testified that when making the said trading trip on the said second day of July he passed along the public road and by the said gate about ten o'clock in the morning, and that he did not see or speak to the said deceased, and did not, on that or any other day, furnish any calomel to her; that he was accompanied on the said second day of July, while passing along said road and by said gate, by one Miss Maude Smith, and that they drove along said public road to his place of business in the town of Nebo, and that he remained in his place of business and said village of Nebo during the remainder of that day and all of the evening of that day. The said Miss Smith was produced as a witness and her testimony fully corroborated that of the plaintiff in error. In addition to this, Van Pinkerton and Mrs. Van Pinkerton testified that Miss Maude Smith accompanied plaintiff in error on that trip, and that they both returned to the store at Nebo from the said trading trip on the said second day of July, about the hour of twelve o'clock on that day, and that the plaintiff in error remained at his home and in the store the remainder of the afternoon and evening of that day. In rebuttal the People produced John and Lawrence Springer and Alfonso Couch, who testified they saw the plaintiff in error driving his trading wagon on the public road in front of the gate which led to the home of the deceased, on the said second day of July, and that he stopped at the gate and there met the deceased, and that plaintiff in error and the deceased engaged in a conversation there, and that the plaintiff in error remained there for about forty minutes. This conflict of testimony presented to the jury for their deter-

mination a question of fact materially affecting the guilt or innocence of the accused. It was essential to the conviction of the plaintiff in error, as the case was presented by the evidence, the jury should find the plaintiff in error supplied the deceased with calomel, as she in her dying declarations declared he had done, and that her death resulted from the use of that drug. The record is barren of proof tending to show that plaintiff in error contributed to her death by any other manner or means or otherwise aided or abetted therein, yet the court gave to the jury the following instructions:

27. "Even though you may believe, from the evidence, that the defendant did not, by his own hand and act, produce the abortion charged, if you believe, from the evidence, beyond a reasonable doubt, that the same was so produced as charged in the indictment, yet if you do believe, from the evidence, beyond a reasonable doubt, that the same was committed by some person in manner and form as charged in the indictment, and if you further believe, from the evidence, beyond a reasonable doubt, that the person so committing it (if the evidence so shows, beyond a reasonable doubt, whether it was Cora Alice Grimes herself or another,) was advised, encouraged and induced by the defendant to so commit it, and if you further believe, from the evidence, beyond a reasonable doubt, that the death of Cora Alice Grimes was thereby occasioned and caused as charged in the indictment, then, if you find the facts as last above stated, it would be your duty to find the defendant guilty."

45. "If you believe, from the evidence, beyond a reasonable doubt, that the defendant did, in manner and form as charged, either by word, act, gesture, sign or otherwise, intentionally cause or induce, aid, advise or encourage said Cora Alice Grimes to produce the abortion in manner and form as charged in the indictment, and that such abortion, if the evidence shows it beyond a reasonable doubt, resulted in and caused the death of Cora Alice

Grimes in manner and form as charged, you should find the defendant guilty."

The effect of these instructions was to relieve the jury from the difficult task of determining the truth as to the controverted question whether the plaintiff in error supplied the deceased with calomel and thus brought about the miscarriage and her subsequent death, and to invite them to return a verdict finding the plaintiff in error guilty though they were unable to determine whether he supplied her with calomel, and even if they believed some person other than the plaintiff in error "committed" the abortion by any means, if, upon a general view of the whole case, the jury entertained the belief the plaintiff in error had advised, encouraged or aided and abetted the perpetration of the alleged crime. When it is remembered there was evidence tending to show the plaintiff in error had had sexual intercourse with the deceased, and tending to show she became pregnant and aborted the fœtus, the vice of these instructions becomes manifest. They might well be understood by the jury to suggest that suspicions which naturally arise from proof of the existence of a motive to commit the crime would justify the conclusion the party having such motive had by some "word, act, gesture, sign,".or in some other manner, aided or abetted in the perpetration of the offense.

Plaintiff in error has assigned, and his counsel in their brief have argued, other alleged errors, but it does not seem necessary we should extend this opinion by reference thereto.

For the reasons indicated we think the plaintiff in error did not have that fair and impartial trial to which he was entitled by the law of the land. The judgment of conviction is reversed and the cause remanded.

*Reversed and remanded.*