(No. 6051. November 22, 1933.)

STATE, Respondent, v. ERNEST FREITAG, Appellant.

[27 Pac. (2d) 68.]

D. L. Rhodes and Geo. H. Van de Steeg, for Appellant.

Bert H. Miller, Attorney General, and Ariel L. Crowley, Assistant Attorney General, for Respondent.

MORGAN, J.—This is an appeal from a judgment of conviction of manslaughter. The evidence shows appellant drove an automobile along a public highway, after dark, and ran it against another automobile being driven along the highway in the same direction, and that Floyd Hains, who was riding in the last mentioned car, was thrown out and killed as a result of the collision.

Appellant complains he was not given a fair and impartial trial, and assigns as error the action of the trial judge in cross-examining him in the presence of the jury. The case must be reversed on this specification of error, and other assignments will not be discussed because the questions therein presented are not likely to arise on a new trial.

The following quotation from the opinion of Chief Justice Cooley, in *Wheeler v. Wallace,* 53 Mich. 355, 19 N. W. 33, is applicable to this case:

"It is very unusual to have exception taken on writ of error to the manner and deportment of the trial judge in the conduct of the trial, and under ordinary circumstances a court of review would not scrutinize very closely his methods when no error in his rulings was alleged. Still, it is possible for a judge to deprive a party of a fair trial, even without intending to do so, by the manner in which he conducts the case, and by a plain exhibition to the jury of his own opinions in respect to the parties, or to their case; and when it is apparent that a fair trial has not been had, a court of review should give relief as soon for that cause as for any other. The fact that the duty to do so is unusual or unpleasant, is no reason for declining it.

"In this case we are satisfied the plaintiff has not had a fair trial. In saying this it is not necessary to impute to the judge any purpose to be a partisan in the case, or otherwise unfair. It is not likely he intended to try the case with less than his customary urbanity and courtesy; and when he brings before the jury, as he does in his charge, the familiar figure of the goddess of justice, with her scales nicely weighing and scrutinizing the evidence, it is to be assumed that he meant to be as impartial himself as he directed the jury to be. It is, nevertheless, possible for a judge, however correct his motives, to be unconsciously so disturbed by circumstances that should not affect him, as to do and say, in the excitement of a trial, something, the effect of which he would not at the time realize, and thereby accomplish a mischief which was not designed. Possibly, such circumstances may have existed in this case."

To know the judge who tried this case is to acquit him of any suspicion that he was actuated, in doing the things complained of, by an improper motive. No jurist of our acquaintance has, or deserves, a better reputation for integrity and fairness than does he. However, as argued by counsel for appellant, the greater the reputation of the

judge for impartiality, the greater the injury to the litigant against whom he appears to throw the weight of his influence, whether consciously or unconsciously.

Counsel for respondent insists, in effect, the judge sought not to injure, but to aid appellant by his cross-examination. We are unable to adopt this view. The impropriety of the presiding judge participating in the trial of a case in aid of one of the parties is of the same degree as would be in case of his participation in aid of the other. Furthermore, we are not concerned here with what may have been in the mind of the judge which prompted the cross-examination, our concern is as to what that cross-examination may have placed in the minds of those who composed the jury which tried appellant.

The following is quoted from the cross-examination of appellant by the prosecuting attorney:

"Q. Would you say your brakes were in a dangerous condition?

"A. No, they were not dangerous.

"Q. Driving your car at 45 miles an hour, you could stop within the distance that your lights shone?

"A. I could have under reasonable conditions.

"Q. What do you call reasonable conditions?

"A. Where, naturally where there would be some reason to stop.

"Q. Wasn't it a reason to stop when there is a car right ahead of you?

"A. I couldn't stop that close, no.

"Q. You couldn't slow it up enough to dodge around it?

"A. No, not with the condition of the car, I could not.

"Q. Not in the condition in which your car was?

"A. Not in the condition of my car.

"Q. The condition of the brakes on your car?

"A. Not the brakes.

"Q. What else?

"A. Well, for the same reason that it was turned over before; because you couldn't turn it; the shock absorbers on the rear of the car were both broken, and those Buicks

have cantilever springs and then with these shock absorbers broken, you can't turn quickly, your car turns over very easy.

. . . . . . . . . . . .

"Q. Then it was the condition of the car, being unable to turn it, and not the brakes?

"A. Well, I suppose that was partly it.

"Q. How long had these shock absorbers been broken?

"A. I don't know. Some time before that.

"Q. Well, how long before had it turned over?

"A. I don't know exactly how long. Some time during the summer.

"Q. Had the shock absorbers been broken during all of that time?

"A. The one on the outer side had."

At the end of the cross-examination the following occurred:

"The Court: Just a minute. I want to ask a few questions and my questions are subject to objection.

"Q. You say that the shock absorbers had been broken for several months?

"A. One of them had.

"Q. Did you know all that time that your car was liable to turn over by turning to the left?

"A. I did. I tried several times to get new straps for it but they didn't have them in town and in Boise they told me, all the garage men I asked about it said they were high priced and they didn't carry them in stock and they would try to get some.

"Q. I don't care about that. You knew the car was liable to turn over if you turned suddenly to the left?

"A. Yes.

"Q. How long had your brakes been in bad shape?

"A. I never had had good brakes, that is really good brakes. I had new lining put on several times but they never seemed to be able to fix them up. Nothing seemed to be wrong with them but they wouldn't work; they would work fair.

"Q. But you knew on the 11th of November (the date of the collision) that the brakes were in bad shape?

"A. I knew the foot brakes were in bad shape.

"Q. Did you drink anything from the time of the accident between that and the time when you went back to the city jail?

"A. No, I did not."

There was evidence that appellant appeared to be intoxicated when he was taken into custody at the scene of the collision and immediately after he was taken to the city jail. Testimony showing he did not drink intoxicating liquor between the time of the collision and his arrival at the jail would invite the inference that if he was intoxicated when he reached the jail he was in that condition when the collision occurred.

I. C. A., sec. 48–502, makes it a crime for one who is under the influence of intoxicating liquor to drive any vehicle upon any highway within this state. Sec. 48–540 requires that "every motor vehicle when operated upon a highway shall be equipped with brakes adequate to control the movement of and to stop and to hold such vehicle," sec. 48–557 makes a violation of any of the provisions of the chapter relating to the operation of vehicles on highways a crime, and sec. 17–1106 defines involuntary manslaughter to be "the unlawful killing of a human being, without malice, . . . . in the perpetration of or attempt to perpetrate any unlawful act, other than arson, rape, robbery, burglary, or mayhem; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection."

It is apparent the cross-examination of appellant by the judge tended to show he was guilty of involuntary manslaughter, and the jury probably inferred from the judge's cross-examination that he was in sympathy with the prosecution and was trying to bring about the conviction of appellant.

There is considerable conflict among the authorities, probably more apparent than real, with respect to the rights and

duties of judges in the matter of the examination of witnesses. The substance of judicial opinion on this question is to be found in 16 C. J., p. 831, sec. 2100, as follows:

"For the purpose of eliciting evidence which has not otherwise been brought out, it is proper for the judge to put questions to a witness either on his examination in chief or on his cross-examination, and where anything material has been omitted, it is sometimes his duty to examine a witness. The judge may recall and examine a witness in order to supply an omission of proof on a material point. But he must conduct his examination in such a manner as to impress the jury with the idea that he is entirely impartial, and he must also conduct the examination in such a way as not to indicate his opinion on the merits or any doubt as to the credibility of the witness. He should not ask a question which is based upon the assumption of defendant's guilt of the offense charged. It has been held, however, that, although it is the right of the judge to examine witnesses when necessary in the administration of justice, it is better practice for him not to do so unless it is necessary."

It is said in *Bolte v. Third Ave. R. Co.*, 38 App. Div. 234, 56 N. Y. Supp. 1083:

"Every one who is at all familiar with the conduct of jury trials knows that the jury are largely influenced in their conclusions upon the case by what they believe to be the impression or the opinion of the judge. They obtain this belief, not only from what the judge says in his instructions, but from his appearance, his manner, the remarks that he makes in his rulings, and generally, from which they infer his opinions in respect to the parties and the case. So far as this impression of the jury is received while the judge confines himself strictly to the performance of the duty that is imposed upon him, it is probably unavoidable, and, indeed, a thing to be desired. But the examination of witnesses is a more appropriate function of counsel, and as it is no part of the duty of the judge to enter upon and conduct an extended examination of a witness, and thereby

put himself in the place of the counsel who should perform that duty, the inference which the jury necessarily draws from seeing the court in that position must be unfavorable to the person against whom the examination proceeds, and it is quite likely to result in injustice, instead of bringing about a fair and impartial consideration of the case by the jury, which is the thing to be sought."

In *Watson v. Aronberg*, (Mo. App.) 15 S. W. (2d) 356, the court said:

"It is the right and duty of a trial judge to question witnesses so that the facts are properly brought before the jury, yet neither by his questions nor the manner in putting them may he indicate his own opinion. In asking questions, he should not use any expression which might intimate to the jury his opinion upon the facts or his view of the veracity or credibility of a witness. Jurors are quick to note any indication on the part of the trial judge of his impression of any evidence, or the credibility of any witness offered in the case, and the minds of the jurors are sensitive to, and are prone to follow even slight judicial expressions of this character.

"As was well said in *Dreyfus v. Railway Co.*, 124 Mo. App. 585, 102 S. W. 53: 'Jurors are quick to catch an impression on the mind of the presiding judge, in respect to the evidence of the merits of the cause, and his influence, when thrown into the scale, is of great weight and may be controlling. He cannot, therefore, be too cautious in concealing from the jury his convictions or impressions on all questions which should be left to the jury to decide.' "

In *People v. Schultz*, 300 Ill. 601, 133 N. E. 379, 381, the supreme court of Illinois said:

"All who are familiar with the trial of cases know that there is often much more effect in the expression of the examiner's face or the inflection of his voice than in the mere words used. The examination of witnesses is the function of counsel, and the instances are rare and the conditions exceptional which will justify the presiding judge in conducting an extensive examination. In conducting an examina-

tion of any length it is almost impossible for the judge to preserve a judicial attitude. Jurors watch the trial judge closely and generally place great reliance on what he says or does. They are quick to perceive any leaning of the court. Jurors naturally note every remark dropped by the court and every act done by him during the progress of the trial, and invariably they arrive at a conclusion as to what the court thinks about the case. Whatever is said or done by the trial judge is the subject of comment among the jurymen. It is therefore necessary for judges presiding at trials to exercise the greatest care in what they say and do in the presence of the jury lest they give the jury the impression that they favor one side or the other. It is the duty of the judge to see that all the truth is brought out so that the jury can arrive at a true verdict, and sometimes it is necessary for him to ask a question or two to clear up the situation. It is generally better for the court to suggest to counsel the additional information he would like to have brought out and let counsel further examine the witness. When the court asks a question and secures an answer, it, of course, renders unusual prominence to that question and answer and may unduly influence the jury in their verdict.''

See, also, *State v. Crotts,* 22 Wash. 245, 60 Pac. 403; *Koontz v. State,* 10 Okl. Cr. 553, 139 Pac. 842, Ann. Cas. 1916A, 689; *Harrison v. State,* 11 Okl. Cr. 14, 141 Pac. 236; *State v. Jackson,* 83 Wash. 514, 145 Pac. 470; *Rhodes v. State,* 202 Ind. 159, 172 N. E. 176; *State v. Drew,* (Mo.) 213 S. W. 106; *State v. Furtick,* 147 S. C. 82, 144 S. E. 839, 84 A. L. R. 1164; *Dunn v. People,* 172 Ill. 582, 50 N. E. 137; *Adler v. United States,* 182 Fed. 464.

The cross-examination, by the judge, was of such a nature as to prejudice the jury against appellant and prevent him from having a fair and impartial trial.

Objection was not made to any question propounded by the judge, and counsel for respondent argue that, since the cross-examination was not objected to, an assignment of error may not be predicated thereon.

The statement of the judge, made preliminary to his cross-examination, leaves some doubt as to his meaning. He said: " . . . . my questions are subject to objection." It may be he meant to be understood that counsel would be at liberty to object to any question he propounded (which they knew without being told) and it may be he meant to convey the idea that his questions would be deemed objected to, thus protecting the parties from damage which would arise from objecting, in the presence of the jury, to questions propounded by the judge. He probably meant to invite the attorneys to object to his questions on any of the grounds usually urged against questions propounded by opposing counsel, and we will assume this is the meaning of the above quoted remark and that counsel so understood it.

The matter under consideration does not relate to the form of the questions propounded nor to the admissibility of the evidence thereby adduced. No reason existed for objecting to the questions had they been propounded by the prosecuting attorney, other than, probably, that of repetition, in that they related to subjects about which he had already cross-examined the witness. The error relied on is not predicated on the admissibility of the testimony adduced by these questions, but on the conduct of the judge in propounding them. The questions were not seriously objectionable. This cannot be said of the conduct.

Counsel for respondent insist that interrogation of the witness by the judge is not a judicial act within the meaning of I. C. A., sec. 19–2301, providing: "Any ruling, instruction, order, decision, judgment, and all judicial acts of the court or judge thereof, in a criminal action, occurring before or after judgment shall be deemed excepted to. The same need not be embodied in a bill of exceptions but, when appearing in the records, files, minutes or transcript of the action may be reviewed upon appeal." In support of this contention we are cited to *State v. Frank,* 51 Ida. 21, 1 Pac. (2d) 181, *State v. Smailes,* 51 Ida. 321, 5 Pac. (2d) 540, *State v. Ramirez,* 34 Ida. 623, 203 Pac. 279, 29 A. L. R. 297, and *State v. Keyser,* 38 Ida. 57, 219 Pac. 775.

In the Frank case the court held statements and comments by the judge, in ruling on objections to evidence, tending unduly to emphasize the theory of the prosecution to the prejudice of appellant, were not "judicial acts of the court or judge thereof" and not deemed excepted to. The Smailes case is to the same effect. The nature of the remarks by the judges, complained of in the Frank and Smailes cases, does not appear in the opinions, nor does the court favor us with its reasons for concluding they were not "judicial acts" within the meaning of the law requiring that certain acts be deemed excepted to.

*State v. Ramirez* was decided in 1921 and *State v. Keyser* in 1923, when C. S. 1919, secs. 9006 to 9012, inclusive, relating to exceptions and bills of exceptions and the method of procuring review of errors relied on, were in force and effect. In 1927 the legislature, by chap. 24 of the session laws of that year, enacted what is now I. C. A., sec. 19-2301, above quoted, and expressly repealed the sections of Compiled Statutes above referred to. Therefore, the Ramirez and Keyser cases are not decisive of the question before us.

Webster's New International Dictionary defines the word "judicial" thus: "Of or pertaining or appropriate to the administration of justice, or courts of justice, or a judge thereof, or the proceedings therein; as, judicial power, judicial proceedings; distinguished in general from legislative, executive, administrative, ministerial."

In *Board of Commissioners v. Northern Pac. R. Co.*, 10 Mont. 414, 25 Pac. 1058, 1060, the supreme court of Montana said:

"The Century Dictionary, the most thorough English lexicon of which we have any knowledge, devotes a large space to the definition of the word 'judicial.' Among other things it says: 'Of or belonging to a court of justice; of or pertaining to a judge; pertaining to the administration of justice; proper to a court of law; consisting of or resulting from legal inquiry or judgment, as judicial power or proceedings; a judicial decision, writ, sale, or punishment; de-

terminative; giving judgment. Judicial act, an act involving the exercise of judicial power.' ''

The act of a judge, who cross-examines a witness, while presiding at a trial, cannot be said to be either legislative, executive, administrative or ministerial. It is purely judicial; is deemed excepted to "and need not be embodied in a bill of exceptions but, when appearing in the records, files, minutes or transcript of the action may be reviewed upon appeal."

The judgment appealed from is reversed, with instruction to grant a new trial.

Holden and Wernette, JJ., concur.

Budge, C. J., and Givens, J., dissent.

Petition for rehearing denied.